Stephen M. FLATOW, Plaintiff,

v.

The ISLAMIC REPUBLIC OF IRAN, the Iranian Ministry of Information and Security, Ayatollah Ali Hoseini Khamenei, Ali Akbar Hashemi–Rafsanjani, Ali Fallahian–Khuzestani, and John Does 1–99, Defendants.

No. 97–396 (RCL).

United States District Court, District of Columbia.

March 11, 1998.

4

Thomas Fortune Fay, Thomas Fourtune Fay, P.C., Steven R. Perles, Anne–Marie Lund Kagy, Steven R. Perles, P.C., Washington, DC, for Plaintiff.

## ORDER AND JUDGMENT

LAMBERTH, District Judge.

For the reasons set forth in the accompanying findings of Fact and Conclusions of Law, it is hereby

ORDERED that judgment be and it is entered in favor of Plaintiff Stephen M. Flatow, as Administrator of the Estate of Alisa Michelle Flatow, against Defendants the Islamic Republic of Iran, the Iranian Ministry of Information and Security, Ayatollah Ali Hoseini Khamenei, Ali Akbar Hashemi–Rafsanjani, and Ali Fallahian–Khuzestani, jointly and severally, for funeral expenses and the loss of accretions to the Estate of Alisa Michelle Flatow in the amount of ONE MILLION FIVE HUNDRED THIRTEEN THOUSAND TWO HUNDRED TWENTY DOLLARS ($1,513,220.00), said amount to be apportioned in accordance with the intestate laws of the State of New Jersey; it is further

ORDERED that judgment be and it is entered in favor of Plaintiff Stephen M. Flatow, as Administrator of the Estate of Alisa Michelle Flatow, against Defendants the Islamic Republic of Iran, the Iranian Ministry of Information and Security, Ayatollah Ali Hoseini Khamenei, Ali Akbar Hashemi–Rafsanjani, and Ali Fallahian–Khuzestani, jointly and severally, for decedent's pain and suffering in the amount of ONE MILLION DOLLARS ($1,000,000.00); it is further

ORDERED that judgment be and it is entered upon application of Plaintiff Stephen M. Flatow, on behalf of decedent's parents and siblings, against Defendants the Islamic Republic of Iran, the Iranian Ministry of Information and Security, Ayatollah Ali Hoseini Khamenei, Ali Akbar Hashemi–Rafsanjani, and Ali Fallahian–Khuzestani, jointly and severally, for solatium in the total amount of TWENTY MILLION DOLLARS, allocated as follows: to decedent's father, Stephen M. Flatow, FIVE MILLION DOLLARS ($5,000,000.00); to decedent's mother, Rosalyn Flatow, FIVE MILLION DOLLARS ($5,000,000.00); to decedent's sister, Gail Flatow, TWO MILLION FIVE HUNDRED THOUSAND DOLLARS ($2,500,000.00); to decedent's sister, Francine Flatow, TWO MILLION FIVE HUNDRED THOUSAND DOLLARS ($2,500,000.00); to decedent's sister, Ilana Flatow, TWO MILLION FIVE HUNDRED THOUSAND DOLLARS ($2,500,000.00); and to decedent's brother, TWO MILLION FIVE HUNDRED THOUSAND DOLLARS ($2,500,000.00); it is further

ORDERED that judgment be and it is entered in favor of Plaintiff Stephen M. Flatow, as Administrator of the Estate of Alisa Michelle Flatow, and against Defendants the Islamic Republic of Iran, the Iranian Ministry of Information and Security, Ayatollah Ali Hoseini Khamenei, Ali Akbar Hashemi–Rafsanjani, and Ali Fallahian–Khuzestani, jointly and severally, for punitive damages in the amount of TWO HUNDRED TWENTY–FIVE MILLION DOLLARS ($225,000,000.00); and it is further

ORDERED that the Clerk of Court cause a copy of this Order and the accompanying Findings of Fact and Conclusions of Law to be translated into Farci and transmitted to the Department of State for diplomatic service upon Defendants pursuant to 28 U.S.C. § 1608(a)(4), with the costs of translation to be paid by the Plaintiff.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This is an action for wrongful death resulting from an act of state-sponsored terrorism. Defendants have not entered an appearance in this matter. This Court entered Defendants' default on September 4, 1997, pursuant to 28 U.S.C. § 1608(e) and Fed.R.Civ.P. 55(a). Notwithstanding indicia of Defendants' willful default,[1] however, this Court is compelled to make further inquiry prior to entering a judgment by default against Defendants. As with actions against the federal government, the Foreign Sovereign Immunities Act ("FSIA") requires that a default judgment against a foreign state be entered only after plaintiff "establishes his claim or right to relief by evidence that is satisfactory to the Court." 28 U.S.C. § 1608(e); see Compania Interamericana Export–Import, S.A. v. Compania Dominicana de Aviacion, 88 F.3d 948, 951 (11th Cir.1996).

Plaintiff brings this action pursuant to two recently enacted amendments to the FSIA, which grant jurisdiction over foreign states and their officials, agents and employees, and create federal causes of action related to personal injury or death resulting from state-sponsored terrorist attacks. Given these novel enactments, and this Court's special role in the development of foreign sovereign immunity jurisprudence, see 28 U.S.C. § 1391(f)(4), this Court has engaged in a systematic review of dispositive legal issues prior to making its determination that Plaintiff has established his claim and right to relief to the satisfaction of this Court.[2]

## FINDINGS OF FACT

This matter came before the Court for an evidentiary hearing on March 2–3, 1998. The Plaintiff proceeded in the manner of a nonjury trial before the Court and the following findings of fact are based upon the sworn testimony and documents entered into evidence in accordance with the Federal Rules of Evidence. Plaintiff has "establishe[d] his claim or right to relief by evidence that is satisfactory to the Court" as required by 28 U.S.C. § 1608(e). This Court finds the following facts to be established by clear and convincing evidence, which would have been sufficient to establish a *prima facie* case in a contested proceeding:

1 Plaintiff Stephen M. Flatow, a domiciliary of the State of New Jersey, is the father of Alisa Michelle Flatow, decedent, and is also the Administrator of the Estate of Alisa Michelle Flatow. He brings this action in his own right, as Administrator of the Estate of Alisa Michelle Flatow, and on behalf of decedent's heirs-at-law, including Rosalyn Flatow, decedent's mother, and decedent's siblings, Gail, age 21, Francine,

---

1. Service of process was accomplished with the assistance of the Swiss Embassy in Tehran, the United States' protecting power in the Islamic Republic of Iran, on June 8, 1997. This Court has yet to receive any response from Defendants, either through counsel's entry of appearance, or through a diplomatic note. The Islamic Republic of Iran is an experienced litigant in the United States federal court system generally and in this Circuit. See, e.g., Cicippio v. Islamic-Republic of Iran, 30 F.3d 164 (D.C.Cir.1994), cert. denied 513 U.S. 1078, 115 S.Ct. 726, 130 L.Ed.2d 631 (1995); Foremost–McKesson v. Islamic Republic of Iran, 905 F.2d 438 (D.C.Cir.1990); Persinger v. Islamic Republic of Iran, 729 F.2d 835 (D.C.Cir. 1984); Berkovitz v. Islamic Republic of Iran, 735 F.2d 329 (9th Cir.1984), McKeel v. Islamic Republic of Iran, 722 F.2d 582 (9th Cir.1983). The Islamic Republic of Iran also apparently attempted to evade service of process by international registered mail, pursuant to 28 U.S.C. § 1608(a)(3). When the service package was returned to counsel in June 1997, the package had been opened, the return receipt, which counsel had not received, had been completely removed, and the message "DO NOT USA" was written in English across the back of the envelope. This contumacious conduct bolsters the entry of a default judgment. See Commercial Bank of Kuwait v. Rafidain Bank, 15 F.3d 238 (2d Cir.1994).

2. This Court knows of only one other Court which has interpreted these new provisions, the United States District Court for the Southern District of Florida, in an action brought by the families of the Brothers to the Rescue pilots shot down by the Cuban Air Force over the Straits of Florida on February 24, 1996. Alejandre, et al. v. The Republic of Cuba, et al., 996 F.Supp. 1239 (1997). Cases resulting from the bombing of Pan Am Flight 103 have been re-filed under these provisions, and are currently pending before the United States District Court for the Eastern District of New York. See, e.g., Rein v. Socialist People's Libyan Arab Jamahiriya, 995 F.Supp. 325 (E.D.N.Y.1998).

age 18, Ilana, age 16, and Etan, age 14, all decedent's siblings. Affidavit (Exhibit 2) (Exhibit 2) and testimony of Stephen M. Flatow.

2 Alisa Michelle Flatow was born on October 5, 1974 in the United States. She maintained her United States citizenship throughout her life, and was a United States citizen at the time of her death. Affidavit (Exhibit 2) and testimony of Stephen M. Flatow; Report of the Death Of An American Citizen Abroad (Exhibit 9).

3 At the time of her death, Alisa Michelle Flatow was a twenty-year-old Brandeis University student. For the 1995 spring semester, her junior year at Brandeis University, Alisa Michelle Flatow arranged for and participated in an independent foreign study program in Israel. Affidavit (Exhibit 2) and testimony of Stephen M. Flatow; testimony of Dr. Jonathan Sarna; testimony of Alan Mitrani; testimony of Lauren Sloane; testimony of Gail Flatow; testimony of Francine Flatow; decedent's academic records from Brandeis University.

4 While in Israel, she communicated with her father, Plaintiff Stephen M. Flatow, to ask whether she could travel to a community on the Mediterranean Sea with friends. He reviewed their itinerary with her, and as he believed that the Israeli government would not provide civilian passenger bus service unless it were safe to do so and he gave her permission to travel in Gaza. Affidavit (Exhibit 2) and testimony of Stephen M. Flatow.

5 On April 9, 1995, decedent Alisa Michelle Flatow was a passenger on the number 36 Egged bus, which was traveling from Ashkelon, Israel to a Mediterranean resort in the Gush Katif community. Testimony of Kesari Rusa.

6 At or about 12:05 p.m. local time, near Kfar Darom in the Gaza Strip, a suicide bomber drove a van loaded with explosives into the number 36 Egged bus, causing an explosion that destroyed the bus. Testimony of Kesari Rusa; testimony of Orit Taft; testimony of Ezra Mordecai testimony of and videotape by David Shaenbaum; U.S. DEP'T OF STATE, PATTERNS OF GLOBAL TERRORISM 1995 (April 1996).

7 As a result of the explosion, a piece of shrapnel pierced Alisa Michelle Flatow's skull casing and lodged in her brain, causing a severe head injury. Testimony of Dr. Allen Fisher; decedent's medical records from the Soroka Medical Center, with translation from Hebrew (Exhibit 3).

8 Immediately after the explosion, Alisa Michelle Flatow slumped over onto her traveling companion, Kesari Rusa. Her eyes were open and her hands clutched. She received emergency medical treatment on the scene. Because her injuries were so severe, she was among the first of the injured which the Israeli Defense Forces medivac'ed by helicopter to the Soroka Medical Center in B'er Sheva for immediate medical attention. Testimony of Kesari Rusa; testimony of and videotape by David Shaenbaum; testimony of Orit Taft.

9 Upon her arrival at the Soroka Medical Center approximately one hour after the bombing, Alisa Michelle Flatow's pulse and respiration were good without medical assistance. Her pupils reacted to light and she responded to deep pain stimuli. She was assessed as a 5 of a possible 15 on the Glasgow coma scale. She had sustained a depressed skull fracture and intracerebral lacerations. Testimony of Dr. Allen Fisher; decedent's medical records from the Soroka Medical Center, with translation from Hebrew (Exhibit 3).

10 From approximately 3 to 5 pm local time, Alisa Michelle Flatow was in emergency surgery; the entrance wound was debrided and a partial craniotomy was performed in order to alleviate pressure from the intracerebral hemorrhaging and concomitant swelling of brain tissue within the skull. Testimony of Dr. Allen Fisher; decedent's medical records from the

Soroka Medical Center, with translation from Hebrew (Exhibit 3).

11 To a reasonable degree of medical certainty, Alisa Michelle Flatow suffered extreme bodily pain and suffering for at least three to five hours as a result of the injuries she sustained in the bombing. Testimony of Dr. Gregory Threatte.

12 Plaintiff Stephen M. Flatow first heard of the attack on the radio on April 9, 1995 at approximately 7:45 am EST; he immediately began attempts to contact his daughter. That decedent had been on the number 36 Egged bus was confirmed when one of her traveling companions telephoned her family in the United States. Plaintiff made extraordinary efforts to locate his daughter; after several hours, the Medical Center confirmed that she was being treated there and that she was in grave condition. Plaintiff immediately flew to Israel to be with his daughter. Affidavit (Exhibit 2) and testimony of Stephen M. Flatow; testimony of Rosalyn Flatow; testimony of Alan Mitrani.

13 Shortly after his arrival at the Soroka Medical Center the morning of April 10, 1995, the hospital director and Dr. Allen Fisher, the attending physician, informed Stephen M. Flatow that Alisa Michelle Flatow showed no brain activity, that all physical functions relied upon artificial life support, and that there was no hope for her recovery. Affidavit (Exhibit 2) and testimony of Stephen M. Flatow; testimony of Dr. Allan Fisher; decedent's medical records from the Soroka Medical Center, with translation from Hebrew (exhibit 3).

14 The Flatow family is Jewish and observes Orthodox Jewish practice. Orthodox doctrine reveres the sanctity of life and of the body; the traditional view is that all means should be exerted to prolong life, and that the body must be buried intact. However, Orthodox doctrine also considers the saving of one life to be the saving of an entire universe. Alisa Michelle Flatow's condition presented an opportunity to save lives through organ donation, which is extremely rare in Israel precisely because it is incompatible with the sanctity of life and of the body. After consulting with several Rabbis, Stephen M. Flatow requested that no further extraordinary efforts be exerted on behalf of his daughter, that life support be terminated, and that his daughter's organs be harvested for transplant. Alisa Michelle Flatow died at approximately 10:00 a.m. local time on April 10, 1995. Her organs saved three lives and significantly improved the quality of life for several other persons. Affidavit (Exhibit 2) and testimony of Stephen M. Flatow, testimony of Dr. Allan Fisher decedent's medical records from the Soroka Medical Center, with translation from Hebrew (Exhibit 3); testimony of Ari Mendelson (organ recipient).

15 Alisa Michelle Flatow had been accompanied on the bus by two companions who were also United States nationals and were injured as a result of the explosion. United States nationals often rode this bus line. The attack on the bus caused seven other deaths and many injuries, all involving non-United States nationals. Testimony of Kesari Rusa; testimony of Orit Taft; U.S. DEP'T OF STATE, PATTERNS OF GLOBAL TERRORISM 1995 (April 1996).

16 The Shaqaqi faction of Palestine Islamic Jihad claimed responsibility for and in fact perpetrated the terrorist act which caused the death of Alisa Michelle Flatow. Palestine Islamic Jihad is series of loosely affiliated factions rather than a cohesive group. The Shaqaqi faction is a terrorist cell with a small core membership. Its sole purpose is to conduct terrorist activities in the Gaza region, and its sole source of funding is the Islamic Republic of Iran. Testimony of Dr. Reuven Paz; testimony of Dr. Patrick

Clawson; testimony of former FBI Deputy Assistant Director for Counterterrorism Harry Brandon; U.S. DEP'T OF STATE, PATTERNS OF GLOBAL TERRORISM 1995 (April 1996).

17 The Israeli government informed Stephen M. Flatow that the Shaqaqi faction of Palestine Islamic Jihad had claimed responsibility for the bombing, and that their investigation had confirmed that claim. Affidavit of Stephen M. Flatow (Exhibit 2).

18 In July 1996, Plaintiff Stephen M. Flatow and his counsel met with Ambassador Philip Wilcox, who then served as the Department of State's Coordinator for Counterterrorism. During that meeting, he informed Mr. Flatow that the Department of State was satisfied that the group which had claimed responsibility for the bombing, the Shaqaqi faction of Palestine Islamic Jihad, had in fact perpetrated the bombing, and that the Islamic Republic of Iran provided approximately two million dollars to Palestine Islamic Jihad annually in support of its terrorist activities. Affidavit of Stephen M. Flatow (Exhibit 2).

19 Defendant the Islamic Republic of Iran is a foreign state and has been designated a state sponsor of terrorism pursuant to section 6(j) of the Export Administration Act of 1979 (50 U.S.C.App. § 2405(j)) continuously since January 19, 1984. Defendant provides material support and resources to Palestine Islamic Jihad by supplying funds and training for the Shaqaqi faction's terrorist activities in the Gaza Strip region. Testimony of Dr. Reuven Paz, testimony of Dr. Patrick Clawson, testimony of former FBI Deputy Assistant Director for Counterterrorism Harry Brandon.

20 Defendant the Islamic Republic of Iran sponsors the Shaqaqi faction's terrorist activities within the meaning of 28 U.S.C. § 1605(a)(7) and 28 U.S.C. § 1605 note by providing it with all of its funding. Testimony of Dr. Reuven Paz; testimony of Dr. Patrick Clawson; testimony of former FBI Deputy Assistant Director for Counterterrorism Harry Brandon.

21 Defendant the Iranian Ministry of Information and Security is the Iranian intelligence service, functioning both within and beyond Iranian territory. Acting as an agent of the Islamic Republic of Iran, the Iranian Ministry of Information and Security performed acts within the scope of its agency, within the meaning of 28 U.S.C. § 1605(a)(7) and 28 U.S.C.A. § 1605 note, which caused the death of Alisa Michelle Flatow. Specifically, the Iranian Ministry of Information and Security acted as a conduit for the Islamic Republic of Iran's provision of funds and training to the Shaqaqi faction for its terrorist activities in the Gaza Strip region. Testimony of Dr. Reuven Paz; testimony of Dr. Patrick Clawson; testimony of former FBI Deputy Assistant Director for Counterterrorism Harry Brandon.

22 Defendant Ayatollah Ali Hoseini Khamenei is the Supreme Leader of the Islamic Republic of Iran. Acting as an official of the Islamic Republic of Iran, Defendant Ayatollah Ali Hoseini Khamenei performed acts within the scope of his office, within the meaning of 28 U.S.C. § 1605(a)(7) and 28 U.S.C.A. § 1605 note, which caused the death of Alisa Michelle Flatow. Specifically, Defendant Khamenei approved the provision of material support and resources to the Shaqaqi faction of Palestine Islamic Jihad. Testimony of Dr. Reuven Paz; testimony of Dr. Patrick Clawson; testimony of former FBI Deputy Assistant Director for Counterterrorism Harry Brandon.

23 Defendant Ali Akbar Hashemi–Rafsanjani is the former President of the Islamic Republic of Iran. Acting as an official of the Islamic Republic of Iran, Defendant Ali Akbar Hashemi–Rafsanjani performed acts within the scope of his office, within the meaning of 28 U.S.C. § 1605(a)(7) and 28

U.S.C.A. § 1605 note, which caused the death of Alisa Michelle Flatow. Specifically, Defendant approved the provision of material support and resources to the Shaqaqi faction of Palestine Islamic Jihad. Testimony of Dr. Reuven Paz; testimony of Dr. Patrick Clawson; testimony of former FBI Deputy Assistant Director for Counterterrorism Harry Brandon.

24 Defendant Ali Fallahian–Khuzestani is the former head of the Iranian Ministry of Information and Security. Acting as an official of the Islamic Republic of Iran, Defendant Ali Fallahian–Khuzestani performed acts within the scope of his office, within the meaning of 28 U.S.C. § 1605(a)(7) and 28 U.S.C.A. § 1605 note, which caused the death of Alisa Michelle Flatow. Specifically, Defendant Fallahian approved the provision of material support and resources by the Islamic Republic of Iran to the Shaqaqi faction. Testimony of Dr. Reuven Paz; testimony of Dr. Patrick Clawson; testimony of former FBI Deputy Assistant Director for Counterterrorism Harry Brandon.

25 Defendants the Islamic Republic of Iran, the Iranian Ministry of Information and Security, while acting as an agent of the Islamic Republic of Iran, and Iranian officials Ayatollah Ali Hoseini Khamenei, former President Ali Akbar Hashemi–Rafsanjani, and former Minister Ali Fallahian–Khuzestani, each acting in his official capacity, conspired to provide material support and resources to the Shaqaqi faction of Palestine Islamic Jihad, a terrorist organization, within the meaning of 28 U.S.C. § 1605(a)(7) and 28 U.S .C.A. § 1605 note, which caused the death of Alisa Michelle Flatow. Testimony of Dr. Reuven Paz; testimony of Dr. Patrick Clawson; testimony of former FBI Deputy Assistant Director for Counterterrorism Harry Brandon.

26 Alisa Michelle Flatow's death was caused by a willful and deliberate act of extrajudicial killing because the explosion was caused by a bomb that was deliberately driven into the bus by a member of the Shaqaqi faction of the Palestine Islamic Jihad acting under the direction of Defendants the Islamic Republic of Iran, the Iranian Ministry of Information and Security, Ayatollah Ali Hoseini Khamenei, Ali Akbar Hashemi–Rafsanjani and Ali Fallahian–Khuzestani.

27 As a result of Alisa Michelle Flatow's death, her Estate suffered a loss of accretions which could have been expected to occur during the course of her anticipated life expectancy in the amount of $1,508,750.00. Report (Exhibit 6) and testimony of Dr. Jerome S. Paige.

28 As a result of Alisa Michelle Flatow's death, her heirs-at-law have suffered an economic loss for the expenses associated with her funeral and final services in the amount of $4,470.00. Funeral Home Invoice (Exhibit 4).

29 As the result of Alisa Michelle Flatow's death, her parents and her surviving sisters and brother have suffered and will continue to suffer severe mental anguish and the loss of her society. Testimony of Stephen M. Flatow; testimony of Rosalyn Flatow; testimony of Gail Flatow; testimony of Francine Flatow, testimony of Ilana Flatow, testimony of Etan Flatow, testimony of Alan Mitrani, testimony of Lauren Sloane, testimony of Kesari Rusa.

## I. CONCLUSIONS OF LAW WITH RESPECT TO JURISDICTION

### A. THE FOREIGN SOVEREIGN IMMUNITIES ACT CONTROLS THIS ACTION.

 As this action is brought against a foreign state, its intelligence service acting as its agent, and three of its officials, acting in their official capacity,[3] the Foreign Sovereign

---

3. This Circuit has previously recognized that al-

though the FSIA neither prohibits nor provides

Immunities Act of 1976, 28 U.S.C. §§ 1602–1611 *et seq.* ["FSIA"], as amended, controls this action. The FSIA must be applied in every action involving a foreign state defendant. *Verlinden B.V. v. Central Bank of Nigeria,* 461 U.S. 480, 489, 103 S.Ct. 1962, 76 L.Ed.2d 81 (1983); 28 U.S.C. § 1330. The sole bases for subject matter jurisdiction in an action against a foreign state defendant are the FSIA's enumerated exceptions to immunity. *Argentine Republic v. Amerada Hess Shipping Corp.,* 488 U.S. 428, 434, 109 S.Ct. 683, 102 L.Ed.2d 818 (1989). This Court lacks jurisdiction over this matter unless it falls within one of the FSIA's enumerated exceptions to foreign sovereign immunity. *See Saudi Arabia v. Nelson,* 507 U.S. 349, 355, 113 S.Ct. 1471, 123 L.Ed.2d 47 (1993).

Until the beginning of this century, the United States afforded foreign states absolute immunity from suit in courts of the United States as a matter of common law. *See, e.g., The Schooner Exchange v. M'Faddon,* 11 U.S. (7 Cranch) 116, 3 L.Ed. 287 (1812); *Berizzi Bros. Co. v. S.S. Pesaro,* 271 U.S. 562, 46 S.Ct. 611, 70 L.Ed. 1088 (1926). With the rise of Communism and the consequent outgrowth of state trading and shipping companies, however, the United States began to recognize the restrictive theory of foreign sovereign immunity, which permitted suits arising from a foreign state's commercial activities. *See* S. SUCHARITKUL, STATE IMMUNITIES AND TRADING ACTIVITIES IN INTERNATIONAL LAW (1959); Friedmann, *Changing Social Arrangements in State–Trading States and their Effect on International Law,* 24 LAW & CONTEMP. PROBS. 350 (1959).

The issuance of the Tate Letter, on May 19, 1952, officially marked this transition for United States practice. *See* Letter from Jack B. Tate, Acting Legal Advisor, to Acting Attorney General (May 19, 1952), *re-printed at* 26 DEP'T OF STATE BULL. 984–985 *and reprinted at* Appendix 2 to *Alfred Dunhill of London v. Republic of Cuba,* 425 U.S. 682, 711, 96 S.Ct. 1854, 48 L.Ed.2d 301 (1976) [hereinafter "Tate Letter"]. The Tate Letter announced that the United States would henceforth follow the restrictive theory in making foreign sovereign immunity determinations. In 1976, in order to promote uniform and apolitical determinations, Congress transferred immunity determinations from the Department of State to the judiciary and otherwise essentially codified the Tate Letter's restrictive theory of foreign sovereign immunity in the FSIA. *See* H.R. REP. NO. 1487, 94th CONG., 2D SESS. at 12, *reprinted in* 1976 U.S.C.C.A.N. 6604, 6610–11; GARY B. BORN AND DAVID WESTIN, INTERNATIONAL CIVIL LITIGATION IN UNITED STATES COURTS at 452–453 (2d ed.1992); *see also* M. Sandler, D. Vagts & B. Ristau, eds., *Sovereign Immunity Decisions of the Department of State,* DIGEST OF UNITED STATES PRACTICE IN INTERNATIONAL LAW 1977 at 1017.

Courts steadfastly refused to extend the FSIA as originally enacted beyond commercial activities, *jure gestionis,* to reach public acts, *jure imperii,* outside the United States. This judicial restraint permitted foreign states to use the FSIA as a shield against civil liability for violations of the law of nations committed against United States nationals overseas. *See, e.g., Nelson,* 507 U.S. 349, 113 S.Ct. 1471, 123 L.Ed.2d 47; *Smith v. Socialist People's Libyan Arab Jamahiriya,* 101 F.3d 239 (2d Cir.1996), *cert. denied* — U.S. ——, 117 S.Ct. 1569, 137 L.Ed.2d 714, *reh'g denied* — U.S. ——, 117 S.Ct. 2427, 138 L.Ed.2d 189 (1997) [hereinafter *"Pan Am 103 "*]; *Cicippio v. Islamic Republic of Iran,* 30 F.3d 164 (D.C.Cir.1994), *cert. denied* 513 U.S. 1078, 115 S.Ct. 726, 130 L.Ed.2d 631 (1995); *Princz v. Federal Republic of Germany,* 26 F.3d 1166 (D.C.Cir.1994), *cert. de-*

for its application to defendants who are natural persons, maintenance of a coherent practice regarding foreign sovereign immunity weighs heavily in favor of applying the FSIA to individuals. *First American Corp. v. Al Nahyan,* 948 F.Supp. 1107, 1120 (D.D.C.1996) *citing Herbage v. Meese,* 747 F.Supp. 60, 66 (D.D.C.1990). The FSIA has thus been construed to apply to individuals for acts performed in their official capacity on behalf of either a foreign state or its agency or instrumentality. *El–Fadl v. Central Bank of Jordan,* 75 F.3d 668, 671 (D.C.Cir.1996), *citing Chuidian v. Philippine Nat. Bank,* 912 F.2d 1095, 1099–1103 (9th Cir.1990); *In re Estate of Ferdinand E. Marcos Human Rights Litigation,* 978 F.2d 493, 496–97 (9th Cir.1992); *Kline v. Kaneko,* 685 F.Supp. 386 (S.D.N.Y.1988); *Rios v. Marshall,* 530 F.Supp. 351, 371–72 (S.D.N.Y. 1981).

**12**

*nied,* 513 U.S. 1121, 115 S.Ct. 923, 130 L.Ed.2d 803 (1995).

### 1. RECENT AMENDMENTS TO THE FOREIGN SOVEREIGN IMMUNITIES ACT CREATE SUBJECT MATTER JURISDICTION AND FEDERAL CAUSES OF ACTION FOR CERTAIN ACTS OF STATE SPONSORED TERRORISM.

In 1996 Congress took action which effectuated an even greater change than that represented by the Tate Letter. In the Antiterrorism and Effective Death Penalty Act of 1996, Congress lifted the immunity of foreign states for a certain category of sovereign acts which are repugnant to the United States and the international community—terrorism. Pub.L. 104–132, Title II, § 221(a), (April 24, 1996), 110 Stat. 1241 *codified at* 28 U.S.C.A. § 1605 (West 1997 Supp.) [hereinafter "state sponsored terrorism exception"]. That Act created an exception to the immunity of those foreign states officially designated by the Department of State as terrorist states [4] if the foreign state commits a terrorist act, or provides material support and resources to an individual or entity which commits such an act, which results in the death or personal injury of a United States citizen. *See* 28 U.S.C. § 1605(a)(7) [5]; *see also* H.R.REP. NO. 383, 104TH CONG., 1ST SESS.1995 at 137–38, *available at* 1995 WL 731698.

Although the Antiterrorism Act created a forum competent to adjudicate claims arising from offenses of this nature, serious issues remained, in particular, the causes of action available to plaintiffs. Congressman Jim Saxton sponsored an amendment to 28 U.S.C. § 1605(a)(7) with the intent to clarify this and other issues. In Congressman Saxton's experience as Chairman of the House Task Force on Counterterrorism and Unconventional Warfare and member of the House National Security Committee, in order for the exception for immunity to have the desired deterrent effect, the potential civil liability for foreign states which commit and sponsor acts of terrorism would have to be substantial. *See* Congressman Jim Saxton, News Release: *Saxton to the Flatow Family: "Be Strong, America Is Behind You"* (February 26, 1997); *see also* NORMAN J. SINGER, 2 SUTHERLAND ON STATUTORY CONSTRUCTION at § 48.16 (5th ed.1992, 1997 Supp.) *citing Brock v. Pierce County,* 476 U.S. 253, 106 S.Ct. 1834, 90 L.Ed.2d 248 (1986). Therefore, the amendment to 28 U.S.C. § 1605(a)(7) expressly provided, *inter alia,* that punitive damages were available in actions brought under the state sponsored terrorism exception to immunity. *See* H.R. CONF. REP. 863, 104TH CONG, 2ND SESS. 1996 *reprinted at* 1996 U.S.C.C.A.N. 924; Senator Frank Lautenberg, News Release: *Flatow Family's Unprecedented Lawsuit Against Iran Will Help Deter Future Acts of Terrorism* (February 26, 1997). The amendment, *Civil Liability for Acts of State Sponsored Terrorism,* was enacted on September 30, 1996 as part of the 1997 Omnibus Consolidated Appropriations Act, Pub.L. 104–208, Div. A, Title I § 101(c) [Title V, § 589] (September 30, 1996), 110 Stat. 3009–172 *reprinted at* 28 U.S.C.A. § 1605 note (West. 1997 Supp.). This provision of law is commonly referred to as the "Flatow Amendment."

The Flatow Amendment is apparently an independent pronouncement of law, yet it has been published as a note to 28 U.S.C. § 1605, and requires several references to 28 U.S.C. § 1605(a)(7) *et seq.* to reach even a preliminary interpretation. As it also effects a substantial change to 28 U.S.C. § 1605(a)(7), it appears to be an implied amendment. *See* 1A SUTHERLAND ON STATUTORY CONSTRUCTION at § 22.13 ("An implied amendment is an act which purports to be independent, but which in substance alters, modifies, or adds to a prior act."); *see also id.* at § 22.20–21. The brief explanation of the Flatow Amendment's purpose in the House Conference Report explicitly states that it was intended to in-

---

4. In addition to the Islamic Republic of Iran, the foreign states currently designated as sponsors of terrorism pursuant to 50 U.S.C.App. § 2405(j) are: Cuba, Syria, Iraq, Libya, Sudan and North Korea. *See* 22 C.F.R. § 126.1(d) (current through October 31, 1997).

5. Pub.L. 105–11 (April 25, 1997), 111 Stat. 22, § 1 amended 28 U.S.C. § 1605(a)(7)(B)(ii) to substitute "neither the claimant nor the victim was" for "the claimant or victim was not"; *see also* H.R.Rep. No. 48, 105TH CONG., 1ST SESS. (April 10, 1997), *available at* 1997 WL 177368.

crease the measure of damages available in suits under 28 U.S.C. § 1605(a)(7). *See* H.R. CONF. REP. 863, 104TH CONG, 2ND SESS.1996, *reprinted at* 1996 U.S.C.C.A.N. 924. Both the Flatow Amendment and 28 U.S.C. § 1605(a)(7) address the same subject matter, and were enacted during the same session of Congress, only five months apart. Interpretation *in pari materia* is therefore the most appropriate approach to the construction of both provisions, 1A SUTHERLAND ON STATUTORY CONSTRUCTION at § 22.32. The amendment should be considered to relate back to the enactment of 28 U.S.C. § 1605(a)(7) as if they had been enacted as one provision, *id.* at §§ 22.29–31, 34–36, and the two provisions should be construed together and in reference to one another. *Id.* at § 22.29 n. 16 *citing United States v. Dickerson,* 310 U.S. 554, 60 S.Ct. 1034, 84 L.Ed. 1356 (1940). Interpretation of 28 U.S.C. § 1605(a)(7) and the Flatow Amendment *in pari materia* demonstrates the coherent legislative intent behind the two enactments.

**2. 28 U.S.C. § 1605(a)(7) AND 28 U.S.C.A. § 1605 note APPLY RETROACTIVELY FOR THE PURPOSES OF ESTABLISHING SUBJECT MATTER AND PERSONAL JURISDICTION.**

■ Although the events complained of herein occurred more than a year prior to the enactment of the Antiterrorism and Effective Death Penalty Act of 1996, 28 U.S.C. § 1605(a)(7) provides a basis for subject matter jurisdiction. Congress has expressly directed the retroactive application of 28 U.S.C. § 1605(a)(7) in order to further a comprehensive counterterrorism initiative by the legislative branch of government:

> The amendments made by this subtitle shall apply to any cause of action arising before, on or after the date of the enactment of this Act [April 24, 1996].

§ 221(c) of Pub.L. 104–132. As the Supreme Court has stated with respect to the application of legislation to pre-enactment conduct, "[w]here congressional intent is clear, it governs." *Kaiser Aluminum & Chemical Corp. v. Bonjorno,* 494 U.S. 827, 837, 110 S.Ct. 1570, 108 L.Ed.2d 842 (1990). Although the application of statutes to pre-enactment conduct is traditionally disfavored, *see Bowen v. Georgetown University Hospital,* 488 U.S. 204, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988), where "Congress has expressly prescribed the statute's proper reach[,] there is no need to resort to judicial default rules." *Landgraf v. USI Film Products,* 511 U.S. 244, 271, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994).

■ Furthermore, the state sponsored terrorism exception to foreign sovereign immunity is a remedial statute. It creates no new responsibilities or obligations; it only creates a forum for the enforcement of preexisting universally recognized rights under federal common law and international law. *See, e.g., Alvarez–Machain v. United States,* 107 F.3d 696, 702 (9th Cir.1996), *cert. denied,* —— U.S. ——, 118 S.Ct. 60, 139 L.Ed.2d 23 (1997) (discussing Torture Victim Protection Act). As with all other civil jurisdiction statutes, 28 U.S.C. § 1605(a)(7) " 'speak[s] to the power of the courts rather than to the rights or obligations of the parties.' " *Landgraf,* 511 U.S. at 274 (discussing Civil Rights Act of 1991) (citation omitted). Almost all courts have upheld the retroactive application of long-arm statutes. *See* 2 SUTHERLAND ON STATUTORY CONSTRUCTION at § 41.09 *citing McGee v. International Life Ins. Co.,* 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957).

At the time of the act complained of herein, the terrorist acts enumerated in 28 U.S.C. § 1605(a)(7) were federal criminal offenses, *see* 18 U.S.C. § 2331. Given mounting Congressional frustration at the refusal of the federal courts to find jurisdiction in cases such as *Princz, Pan Am 103, Cicippio,* and *Nelson,* and the progressive development of United States legislation and jurisprudence on the subject of *jus cogens* violations, *see, e.g., Hilao v. Estate of Marcos,* 103 F.3d 767; *Kadic v. Karadzic,* 70 F.3d 232; *Abebe–Jira v. Negewo,* 72 F.3d 844 (11th Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 96, 136 L.Ed.2d 51 (1996); *Cabiri v. Assasie–Gyimah,* 921 F.Supp. 1189 (S.D.N.Y.1996); *Filartiga v. Pena–Irala,* 630 F.2d 876 (2d Cir. 1980); *Xuncax v. Gramajo,* 886 F.Supp. 162 (D.Mass.1995). *See also Princz,* 26 F.3d at 1176 (D.C.Cir.1994) (Wald, J., dissenting),

the creation of an exception to foreign sovereign immunity which provides jurisdiction over foreign state perpetrators of the acts enumerated in 28 U.S.C. § 1605(a)(7) should not have been unanticipated. "[A]ny expectation ... [to the contrary] ... is rightly disturbed." *Cabiri*, 921 F.Supp. at 1195–96 (S.D.N.Y.1996) (discussing Torture Victim Protection Act), *citing Landgraf*, 511 U.S. at 273–275.

The Islamic Republic of Iran in particular has been aware of United States policy condemning international terrorism at least since the 1979–1981 hostage crisis in Tehran. It has been continuously designated a state sponsor of terrorism since January 19, 1984. Its continued support of terrorist groups has prompted the United States to suspend diplomatic relations and participate in the international embargo, including extraordinary enforcement measures such as trade restrictions. *See* U.S. DEP'T OF STATE, PATTERNS OF GLOBAL TERRORISM 1995 at 23; Iran and Libya Sanctions Act of 1996, Pub.L. 104–72, 104TH CONG., 2D SESS. (August 5, 1996), 110 Stat. 1541. As international terrorism is subject to universal jurisdiction, Defendants had adequate notice that their actions were wrongful and susceptible to adjudication in the United States. Eric S. Kobrick, *The Ex Post Facto Prohibition and the Exercise of Universal Jurisdiction over International Crimes*, 87 COLUM. L. REV. 1515, 1528–30 (1987) (concluding that criminal statutes apply retroactively to international terrorist acts).

■ Therefore, the state sponsored terrorism provision implicates no Constitutionally protected interest which would prohibit the application of 28 U.S.C. § 1605(a)(7) to pre-enactment conduct.

### 3. FEDERAL COMMON LAW PROVIDES THE RULES OF DECISION IN CASE BROUGHT PURSUANT TO 28 U.S.C. § 1605(a)(7) AND 28 U.S.C.A. § 1605 note.

This action is brought pursuant to a new exception to the FSIA which was created as part of a federal initiative to combat international terrorism, the Antiterrorism and Effective Death Penalty Act of 1996. The state sponsored terrorism provisions represent a sea change in the United States' approach to foreign sovereign immunity. For the first time, Congress has expressly created an exception to immunity designed to influence the sovereign conduct of foreign states and affect the substantive law of liability for non-immune acts. *Cf.* H.R. Rep. 94 1487 at 12, *reprinted at* 1976 U.S.C.C.A.N. at 6610; *First National City Bank v. Banco para el Comercio Exterior de Cuba*, 462 U.S. 611, 619–20, 103 S.Ct. 2591, 77 L.Ed.2d 46 (1983).

Cases under the FSIA have considered choice of law issues almost exclusively within the commercial context, and have applied state rules of decision. *See, e.g. First National City Bank*, 462 U.S. at 620; *Joseph v. Office of the Consulate General of Nigeria*, 830 F.2d 1018, 1025 (9th Cir.1987); *Guzel v. State of Kuwait*, 818 F.Supp. 6, 10 (D.D.C. 1993); *Skeen v. Federative Republic of Brazil*, 566 F.Supp. 1414, 1417 (D.D.C.1983); *see also* Joel Mendal Overton, II, *Will the Real FSIA Choice-of-Law Rule Please Stand Up?*, 49 WASH. & LEE L. REV. 1591 (1992). The notable exception is *Liu v. Republic of China;* however in that case, as the political assassination occurred in California, there was no true conflict for choice of law purposes. 892 F.2d 1419, 1425–26 (9th Cir.).

■ The federal choice of law rule follows that of the RESTATEMENT (SECOND) OF CONFLICTS, which provides that the law of the place of the tort is to apply. *See Liu*, 892 F.2d at 1425 *citing* RESTATEMENT (SECOND) OF CONFLICTS § 175 (1969). The Gaza legal code derives from an amalgamation of British mandate law, Egyptian law and Palestinian Authority directives and laws. *See* 1996 COUNTRY REPORTS ON HUMAN RIGHTS: ISRAEL AND THE OCCUPIED TERRITORIES at § 1(e); *available at* http://www.state.gov./ww w/global/-human_rights/1996_hrp_report/occt-err.html; in addition to the administrative difficulties associated with interpreting this unfamiliar foreign law, the United States has a much stronger interest than the Palestinian Authority in Gaza in adjudicating this action arising from a United States citizen's wrongful death. When another jurisdiction has a stronger interest and closer connections to the case, it is appropriate to apply that juris-

diction's law. RESTATEMENT (SECOND) OF CONFLICTS § 175 (1969).

The Supreme Court has recognized that the FSIA "codifies the standards governing foreign sovereign immunity as an aspect of substantive federal law" and that its application will "generally require interpretation of numerous points of federal law." *Verlinden,* 461 U.S. at 497. Subsequently, Congress created jurisdiction and federal causes of action for personal injury or death resulting from state-sponsored terrorism, including its own statute of limitations. These actions indicate Congressional intent that the federal courts create coherent national standards to support this initiative of national significance. In the interest of promoting uniformity of determinations with respect to the liability of foreign states for the terrorist acts of its officials, agents, and employees, this Court will employ interstitial federal common law to determine whether the terrorist acts were within the scope of their office, agency, or employment, as well as any other conclusions of law which typically rely upon state law.[6] *See United States v. Belmont,* 301 U.S. 324, 57 S.Ct. 758, 81 L.Ed. 1134 (1937); *In re Air Crash Disaster Near Saigon, South Vietnam, on April 4, 1975,* 476 F.Supp. 521, 527 (D.D.C.1979); *see also* Sandra Engle, *Note, Choosing the Law for Attributing Liability Under the Foreign Sovereign Immunities Act; A Proposal for Uniformity,* 15 FORDHAM INT'L L.J. 1060 (1991/1992).

## 4. THE EXTRATERRITORIAL APPLICATION OF THE FSIA'S RECENT AMENDMENTS IS PROPER.

 Article I of the Constitution establishes that Congress has "authority to enact laws applicable to conduct beyond the territorial boundaries of the United States." *Aramco,* 499 U.S. at 260–61 (1991). This Court's only duty is to determine "whether Congress chose to attach liability to the conduct outside the United States .... [A]s a court of the United States, we cannot look beyond our own law."[7] *United States v. Alcoa,* 148 F.2d 416, 443 (2d Cir.1945). Congressional intent and legislative purpose demonstrate that 28 U.S.C. § 1605(a)(7) not only applies to extraterritorial conduct, but that one of its express purposes is to affect the conduct of terrorist states outside the United States, in order to promote the safety of United States citizens traveling overseas. *See* 142 C.R. S3454–1 (April 17, 1996) (remarks of Senator Hank Brown on consideration of the conference report); 142 C .R. H2129–05, H2132 (March 13, 1996) (remarks of Representative Ileana Ros–Lehtinen on the proposed Antiterrorism Act); *see* 2A SUTHERLAND ON STATUTORY CONSTRUCTION § 45.05, § 45.09.

Indicia of Congressional intent are readily apparent. *See, e.g., EEOC v. Aramco,* 499 U.S. 244, 260, 111 S.Ct. 1227, 113 L.Ed.2d 274 (1991) (superseded by statute) (Marshall, J., dissenting) *citing Foley Brothers,* 336 U.S. at 285 (1949) (extraterritorial application may be discerned from the entire range of conventional sources). As 28 U.S.C. § 1605(a)(5) already provides jurisdiction over state-sponsored terrorist acts in the United States, *see Liu,* 892 F.2d 1419; *Letelier v. Republic of Chile,* 488 F.Supp. 665 (D.D.C.1980), the state sponsored terrorism exception would be redundant if it were held to apply only within the United States. The provision's arbitration requirement indicates that Congress intended 28 U.S.C. § 1605(a)(7) to create subject matter jurisdiction for claims arising from conduct which occurred within a foreign state. If Congress did not intend for 28 U.S.C. § 1605(a)(7) to apply to extraterritorial conduct, the arbitra-

---

6. As the dedicated venue for actions against foreign states, *see* 28 U.S.C. § 1391(f)(4), the law of District of Columbia provides an appropriate model in developing a federal standard for this determination. *See also Stanford v. Kuwait Airways Corp.,* 89 F.3d 117 (2d Cir.1996).

7. Nevertheless, the extraterritorial application of the state sponsored terrorism exceptions is consistent with international law; three of the five bases for the exercise of extraterritorial jurisdiction are implicated in actions by United States victims of foreign state sponsored terrorism: passive personality (nationality of victim), protective (national security interests), and universal (subject to jurisdiction wherever the offender may be found). *See* RESTATEMENT (THIRD) FOREIGN RELATIONS LAW OF THE UNITED STATES (1986) at § 402(2)-(3), § 403, § 423.

tion requirement, which only applies in cases arising from acts which occur within a defendant foreign state's territory, would be superfluous. *See* 28 U.S.C. § 1605(a)(7)(B)(i). Therefore Congress inherently expressed its understanding that this provision would necessarily apply to extraterritorial conduct.

The general presumption against extraterritorial application exists to prevent inadvertent interference with foreign relations. *See NLRB v. Catholic Bishop of Chicago,* 440 U.S. 490, 500, 99 S.Ct. 1313, 59 L.Ed.2d 533 (1979); *McCulloch v. Sociedad Nacional de Marineros de Honduras,* 372 U.S. 10, 21–22, 83 S.Ct. 671, 9 L.Ed.2d 547 (1963); *Foley Brothers v. Filardo,* 336 U.S. 281, 69 S.Ct. 575, 93 L.Ed. 680 (1949). In actions pursuant to the state sponsored terrorism provisions, however, there is no danger of inadvertent interference with foreign relations; Congress specifically restricted its application to foreign state defendants which the State Department has determined are foreign state sponsors of terrorism. *See* 28 U .S.C. § 1605(a)(7)(A). There is nothing inadvertent about these two new amendments. Indeed, Justice Blackmun has opined that the presumption against extraterritorial application is inherently inapposite to statutes which on their face involve foreign relations, as Congress necessarily considered "distinctively international subject matter." *Sale v. Haitian Centers Council,* 509 U.S. 155, 206–07, 113 S.Ct. 2549, 125 L.Ed.2d 128 (1993) (Blackmun, J., dissenting) (distinguishing *United States v. Curtiss–Wright Export Corp.,* 299 U.S. 304, 57 S.Ct. 216, 81 L.Ed. 255 (1936)).

This Court concludes that the application of the state sponsored terrorism provisions to extraterritorial conduct is proper.

## B. SUBJECT MATTER JURISDICTION

In order to establish subject matter jurisdiction pursuant to 28 U.S.C. § 1605(a)(7), a claim must contain the following statutory elements:

(1) that personal injury or death resulted from an act of torture, extrajudicial killing, aircraft sabotage, or hostage taking; and

(2) the act was either perpetrated by the foreign state directly or by a non-state actor which receives material support or resources from the foreign state defendant; and

(3) the act or the provision of material support or resources is engaged in by an agent, official or employee of the foreign state while acting within the scope of his or her office, agency or employment; and

(4) that the foreign state be designated as a state sponsor of terrorism either at the time the incident complained of occurred or was later so designated as a result of such act; and

(5) if the incident complained of occurred with the foreign state defendant's territory, plaintiff has offered the defendants a reasonable opportunity to arbitrate the matter; and

(6) either the plaintiff or the victim was a United States national at the time of the incident; and

(7) similar conduct by United States agents, officials, or employees within the United States would be actionable.

28 U.S.C. § 1605(a)(7) and 28 U.S.C.A. § 1605 note. While elements (4)-(6) are pure questions of fact, elements (1)-(3) and (7) are mixed questions of law and fact, and, in the absence of settled precedent, require interpretation.

## 1. A SUICIDE BOMBING IS AN ACT OF EXTRAJUDICIAL KILLING.

 Plaintiff describes the cause of his daughter's death as an "extrajudicial killing" within the meaning of 28 U.S.C. § 1605(a)(7). The state-sponsored terrorism exception to immunity expressly adopts the definition of extrajudicial killing set forth in the Torture Victim Protection Act of 1991. *See* 28 U.S.C. § 1605(e)(1). That Act defines an "extrajudicial killing" as

a *deliberated killing* not authorized by a previous judgment pronounced by a regularly constituted court affording all judicial guarantees which are recognized as indispensable by civilized peoples. Such term,

however, does not include any such killing that, under international law, is lawfully carried out under the authority of a foreign nation.

Pub.L. 102–256 at § 3(a), 106 Stat. 73 (March 12, 1992), *reprinted at* 28 U.S.C.A. § 1350 note. (emphasis added). Deliberate is defined as:

> . . . Carried on coolly and steadily, especially according to a preconceived design; given to weighing facts and arguments with a view to a choice or decision; careful in considering the consequences of a step;
> . . .

BLACK'S LAW DICTIONARY 426–27 (6th ed.1990); *see also* H.REP. 102–367(I), 1992 U.S.C.C.A.N. 84. Other courts have found that summary executions, for example, would be considered "extrajudicial killings" within the meaning of 28 U.S.C.A. § 1350 note. *See Lafontant v. Aristide,* 844 F.Supp. 128 (E.D.N.Y. 1994) (dicta). In actions brought under the Alien Tort Statute, 28 U.S.C. § 1350, and the Torture Victim Protection Act, courts have suggested, in the context of command responsibility, that a course of indiscriminate brutality, known to result in deaths, rises to the level of "extrajudicial killings." *See Hilao,* 103 F.3d at 776–77; *Kadic,* 70 F.3d at 242; *Paul v. Avril,* 901 F.Supp. 330, 335 (S.D.Fla.1994); *Xuncax v. Gramajo,* 886 F.Supp. 162, 170 (D.Mass.1995); *Forti v. Suarez–Mason,* 672 F.Supp. 1531, 1537–38 (N.D.Cal.1987). *See also In re Yamashita,* 327 U.S. 1, 14, 66 S.Ct. 340, 90 L.Ed. 499 (1946) (". . . a deliberate plan and purpose to massacre and exterminate . . . unarmed noncombatant civilians . . . *without cause or trial* . . . and without military necessity.") (emphasis added).

The state sponsored terrorism exception to immunity was enacted as part of a comprehensive legislative initiative to squelch international terrorism—the Antiterrorism and Effective Death Penalty Act of 1996. *See* 2A SUTHERLAND ON STATUTORY CONSTRUCTION at § 47.03. Previous treatments of international terrorism by Congress therefore appropriately inform the interpretation of "deliberated killing". *Id.* at § 22.32. One statute *in pari materia* defines terrorism as

. . . mean[ing] premeditated, politically motivated violence perpetrated against noncombatant targets by subnational groups or clandestine agents.

22 U.S.C. § 2656f(d)(2). As the state sponsored terrorism exception expressly incorporates a definition from the United States criminal code chapter on international terrorism, another definition from that chapter is also apropos:

(1) the term "international terrorism" means activities that—

A. involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or of any State, or that would be a criminal violation if committed within the jurisdiction of the United States or of any State;

B. appear to be intended—

i) to intimidate or coerce a civilian population;

ii) to influence the policy of a government by intimidation or coercion;

iii) to affect the conduct of a government by assassination or kidnapping; and

(C) occur primarily outside the territorial jurisdiction of the United States, or transcend national boundaries in terms of the means by which they are accomplished, the persons they appear intended to intimidate or coerce, or the locale in which their perpetrators operate or seek asylum; . . . .

18 U.S.C. § 2331. Attempts to reach a fixed, universally accepted definition of international terrorism have been frustrated both by changes in terrorist methodology and the lack of any precise definition of the term "terrorism." *See, e.g.,* U.S. DEP'T OF STATE, PATTERNS OF GLOBAL TERRORISM at vi, 1, 17; Louis Rene Beres, *The Meaning of Terrorism— Jurisprudential and Definitional Clarifications,* 28 VAND. J. TRANSNAT'L L. 239 (1995). Therefore, the United States characterizes rather than enumerates acts for the purposes of designating foreign state sponsors of terrorism and defining criminal terrorist offenses under federal law. Each of the acts

listed in 28 U.S.C. § 1605(a)(7) fully conform with the foregoing definitions and provisions.

This Court concludes that a suicide bombing conforms with each of the foregoing provisions and definitions, and therefore is an act of "extrajudicial killing" within the meaning of 28 U.S.C. § 1605(a)(7).

## 2. THE ROUTINE PROVISION OF FINANCIAL ASSISTANCE TO A TERRORIST GROUP IN SUPPORT OF ITS TERRORIST ACTIVITIES CONSTITUTES THE PROVISION OF MATERIAL SUPPORT OR RESOURCES WITHIN THE MEANING OF 28 U.S.C. § 1605(a)(7).

 The state-sponsored terrorism provision adopts the definition of "provid[ing] material support or resources" set forth in the federal criminal code. 28 U.S.C. § 1605(a)(7) incorporates 18 U.S.C. § 2339A(a) by reference, which provides that:

> ... "material support or resources" means currency or other financial securities, financial services, lodging, training, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel, transportation, and other physical assets, but does not include humanitarian assistance to persons not directly involved in such violations.

This Court concludes that the routine provision of financial assistance to a terrorist group in support of its terrorist activities constitutes "providing material support or resources" for a terrorist act within the meaning of 28 U.S.C. § 1605(a)(7). Furthermore, as nothing in 18 U.S.C. § 2339A or 28 U.S.C. § 1605(a)(7) indicates otherwise, this Court also concludes that a plaintiff need not establish that the material support or resources provided by a foreign state for a terrorist act contributed directly to the act from which his claim arises in order to satisfy 28 U.S.C. § 1605(a)(7)'s statutory requirements for subject matter jurisdiction. Sponsorship of a terrorist group which causes the personal injury or death of a United States national alone is sufficient to invoke jurisdiction.

## 3. THE PROVISION OF MATERIAL SUPPORT AND RESOURCES TO A TERRORIST GROUP IS AN ACT WITHIN THE SCOPE OF A FOREIGN STATE'S AGENT'S AND HIGH OFFICIALS' AGENCY AND OFFICES.

 The law of *respondeat superior* demonstrates that if a foreign state's agent, official or employee provides material support and resources to a terrorist organization, such provision will be considered an act within the scope of his or her agency, office or employment. *See, e.g., Guzel,* 818 F.Supp. at 10; *Skeen,* 566 F.Supp. at 1417.

 In the District of Columbia, whether an employer is liable for the torts of its employee depends on whether the tort was at least in part "actuated" by an intent to advance the employer's business, and the tort must be foreseeable given the employee's duties. *Weinberg v. Johnson,* 518 A.2d 985, 990 (D.C.1986); *Guzel,* 818 F.Supp. at 10. The acts of an employee under these circumstances, whether lawful or not, and whether expressly prohibited by the employer or not, can be imputed to the employer.

 In order for an agent, official, or employee's unlawful conduct to be imputed to a government, however, the government must share a degree of responsibility for the wrongful conduct. The government must have engaged in the wrongful conduct, either deliberately or permissively, as a matter of policy or custom. *See, e.g., Monell v. N.Y. Dep't of Social Services,* 436 U.S. 658, 694–95, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) (discussing municipal liability under 42 U.S.C. § 1983). This Court concludes that if a foreign state's heads of state, intelligence service, and minister of intelligence routinely provide material support or resources to a terrorist group, whose activities are consistent with the foreign state's customs or policies, then that agent and those officials have acted squarely within the scope of their agency and offices within the meaning of 28 U.S.C. § 1605(a)(7) and 28 U.S.C.A. § 1605 note.

### 4. UNITED STATES OFFICIALS WOULD BE LIABLE FOR PROVIDING MATERIAL SUPPORT OR RESOURCES TO A TERRORIST GROUP WITHIN THE UNITED STATES.

 The Flatow Amendment, 28 U.S.C.A. § 1605 note, clarifies that the liability of foreign states and their officials must be comparable to that of the United States and its agents, officials, and employees officials. This Court concludes that if officials of the United States, while acting in their official capacities, provide material support and resources to a terrorist group which executed a suicide bombing within the United States, those officials would not be immune from civil suits for wrongful death and personal injury. *See* U.S. CONST. AMEND. 5; 42 U.S.C. § 1983.

### C. PERSONAL JURISDICTION

The FSIA provides that personal jurisdiction over defendants will exist where Plaintiff establishes the applicability of an exception to immunity pursuant to 28 U.S.C. § 1604, § 1605, or § 1607 and service of process has been accomplished pursuant to 28 U.S.C. § 1608. *See* 28 U.S.C. § 1330(b); *Verlinden*, 461 U.S. at 485 n. 5. Although service in accordance with 28 U.S.C. § 1608 has been calculated to provide adequate notice to foreign state defendants, *see* H.REP. 94–1487 at 23–26, *reprinted at* 1976 U.S.C.C.A.N. at 6622–25, Courts must make further inquiry; Congress cannot grant jurisdiction where it would be improper under the Constitution. *Verlinden*, 461 U.S. at 491; *Texas Trading & Milling Corp. v. Federal Republic of Nigeria*, 647 F.2d 300, 308 (2d Cir.1981).

### 1. A FOREIGN STATE IS NOT A "PERSON" FOR THE PURPOSES OF CONSTITUTIONAL DUE PROCESS ANALYSIS.

 The Supreme Court has addressed personal jurisdiction in the context of the Foreign Sovereign Immunities Act only twice, and only in dicta. *See Verlinden*, 461 U.S. at 484 n. 5; *Republic of Argentina v. Weltover*, 504 U.S. 607, 619–620, 112 S.Ct. 2160, 119 L.Ed.2d 394 (1992). However, these brief analyses indicate that foreign states may not be entitled to all aspects of Constitutional Due Process guaranteed to individuals. The Court in *Verlinden* did not address whether an analysis beyond the statutory requirements was necessary to establish personal jurisdiction. *See Verlinden*, 461 U.S. at 485 n. 5. The Court in *Weltover* did not find it necessary to decide this issue, given the presence of "minimum contacts" sufficient to satisfy the Due Process Clause under the facts of that case, During its discussion of direct effects and minimum contacts in *Weltover*, however, the Court referred to *South Carolina v. Katzenbach*, in which it had stated that the "States of the Union are not persons for the purpose of the Due Process Clause," 504 U.S. at 619–20 *quoting* 383 U.S. 301, 323–24, 86 S.Ct. 803, 15 L.Ed.2d 769 (1966).

As suggested in *Weltover*, the issue of whether a foreign state is a "person" for the purposes of Constitutional Due Process analysis has rarely, if ever, been squarely presented for consideration, 504 U.S. at 619–20. Most courts have simply assumed that foreign states were entitled to Constitutional Due Process protections, just as courts have assumed that foreign corporations are entitled to Constitutional Due Process protections, at least with respect to the assertion of personal jurisdiction. Once these trends were initiated, on the basis of an assumption, courts have been reluctant to reexamine this issue. *See, e.g., Afram Export Corp. v. Metallurgiki Halyps, S.A.*, 772 F.2d 1358, 1362 (7th Cir.1985) (Posner, J.) ("Countless cases assume that foreign companies have all the rights of U.S. citizens to object to extraterritorial assertions of personal jurisdiction.... The assumption has never to our knowledge actually been examined, but it probably is too solidly entrenched to be questioned at this late date"). This Court does not face Judge Posner's disadvantage; 28 U.S.C. § 1605(a)(7) provides a clean slate.

The merger of subject matter and personal jurisdictional inquiries under the FSIA has contributed to the confusion in the jurisprudence of personal jurisdiction over foreign states. The majority of cases brought under the FSIA involve commercial activity, which

requires an evaluation of the activity's effects in the United States. "Direct effects" language closely resembles that of Constitutional Due Process "minimum contacts." Tandem consideration of these overlapping yet fundamentally discrete analyses as a matter of practice in several Circuits has exacerbated the situation. *See, e.g.,* Hadwin A. Cald, III, *Interpreting the Direct Effects Clause of the Foreign Sovereign Immunities Act's Commercial Activities Exception,* 59 FORDHAM L. REV. 91 (1990). Commentators have noted this reference as a signal that, if the issue were squarely presented, it might decide that a foreign state is not a "person" for the purposes of Constitutional Due Process. *See, e.g.* Sarah K. Schano, Note, *The Scattered Remains of Sovereignty for Foreign States After Republic of Argentina v. Weltover—Due Process Protection or Nothing,* 27 VAND. J. TRANSNAT'L L. 63 (1994). The assumption thus persists that a full Constitutional Due Process analysis is required in all actions against foreign states.

■ It may seem appropriate to consider the foreign state commercial actor as a "person" for the purposes of Constitutional Due Process analysis, considering that

> when a government becomes a partner in any trading company, it divests [sic] itself ... of its sovereign character, and takes that of a private citizen. Instead of communicating to the company its privileges and its prerogatives, it descends to a level with those with whom it associates itself, and takes the character which belongs to its associates ....

*Bank of the United States v. Planters' Bank of Georgia,* 22 U.S. (9 Wheat.) 904, 907, 6 L.Ed. 244 (1824). However, the FSIA requires something more substantial than "minimum contacts" with the United States in order to sustain subject matter jurisdiction under the commercial activity exception. *See* 28 U.S.C. § 1605(a)(2); *Verlinden,* 461 U.S. at 490 ("Congress protected from this danger ... by enacting substantive provisions requiring some form of substantial contact with the United States."). The other exceptions to immunity each have an inherent jurisdictional nexus with the United States, which exceeds "minimum contacts" requirements.

*See id.;* H.REP. 94–1487 at 13–14, *reprinted at* 1976 U.S.C.C.A.N. at 6611–12. Therefore, an inquiry into personal jurisdiction over a foreign state need not consider the rubric of "minimum contacts"; the concept of "minimum contacts" is inherently subsumed within the exceptions to immunity defined by the statute. *See Id.*

Citing *South Carolina v. Katzenbach,* 383 U.S. at 323–24 and *Insurance Corp. of Ireland, Inc. v. Compagnie des Bauxites de Guinee,* 456 U.S. 694, 702, 102 S.Ct. 2099, 72 L.Ed.2d 492 (1982), Judge Silberman has noted the inadequacy of personal jurisdiction doctrine in cases involving disputes between governments within federal systems. *See United States v. Ferrara,* 54 F.3d 825, 832–33 (D.C.Cir.1995) (Silberman, J., concurring); *see also* Harold S. Lewis, Jr., *The Three Deaths of "State Sovereignty" and the Curse of Abstraction in the Jurisprudence of Personal Jurisdiction,* 58 NOTRE DAME L. REV. 699 (1983). When extended to the international system, the deficiencies of jurisprudence of personal jurisdiction increase exponentially, particularly in actions against foreign states.

The Supreme Court has already recognized that a State of the United States is not entitled to substantive due process. *South Carolina v. Katzenbach,* 383 U.S. at 323–24. Similarly, several lower courts have held that the federal government, state governments, political subdivisions and municipalities within the United States are not considered "persons" for the purposes of Fifth Amendment due process analysis. *See State of Okl. By and Through Derryberry v. Federal Energy Regulatory Commission,* 494 F.Supp. 636 (D.C.Okl.1980); *City of Sault Ste. Marie, Mich. v. Andrus,* 532 F.Supp. 157 (D.D.C. 1980); *El Paso County Water Imp. Dist. No. 1 v. International Boundary and Water Com'n,* U.S. Section, 701 F.Supp. 121 (W.D.Tex.1988). *See also Will v. Michigan Dep't of State Police,* 491 U.S. 58, 64, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989) ("in common usage, the term 'person' does not include the sovereign, and statutes employing the word are ordinarily construed to exclude it"). While these decisions have been made primarily within the context of federalism, *see, e.g., In re Herndon,* 188 B.R. 562, 565 n.

8 (E.D.Ky.1995) ("a governmental entity is not a 'person'"), in *Weltover*, the Supreme Court hints that this logic should be extended to the interrelationships between states in the international arena. 504 U.S. at 619. The only other court which has touched upon this issue has concluded that foreign states, like States of the Union, are not "persons" subject to liability under various federal statutes. *See Rios v. Marshall*, 530 F.Supp. 351, 372 n. 22 (S.D.N.Y.1981).

One judge of this Court anticipated this step five years prior to *Weltover*. In *Palestine Information Office v. Shultz*, the Court held that "[i]f the States of the Union have no due process rights, then a 'foreign mission' qua 'foreign mission' surely can have none." 674 F.Supp. 910, 919 (D.D.C.1987). Given the parallels in the procedural deference granted to both the United States and foreign states,[8] this Court concludes that foreign states should hold comparable status to States of the Union and the federal government for the purposes of Constitutional Due Process analysis. *But cf. The Export Group v. Reef Industries*, 54 F.3d 1466, 1476 (9th Cir.1995) (discussing substantive law of liability). As the Supreme Court has recognized, personal jurisdiction can be waived because

> [t]he requirement that a court have personal jurisdiction flows not from Art. III, but from the Due Process Clause. The personal jurisdiction requirement recognizes and protects an individual liberty interest. It represents a restriction on judicial power not as a matter of sovereignty, but as a matter of individual liberty.

*Insurance Corp. of Ireland v. Compagnie des Bauxites de Guinee*, 456 U.S. at 703. It would be illogical to grant this personal liberty interest to foreign states when it has not been granted to federal, state or local governments of the United States.[9]

The House Report's language is unambiguous—it states that *in personam* jurisdiction has been accommodated inherently within the statute; the language does not, whether expressly or by implication, grant a liberty interest for the purposes of substantive due process analysis. *See* H.Rep. 94-1487 at 13-14, *reprinted at* 1976 U.S.C.C.A.N. at 6611-12. Foreign sovereign immunity, both under the common law and now under the FSIA, has always been a matter of grace and comity rather than a matter of right under United States law. *Verlinden*, 461 U.S. at 486, *citing Schooner Exchange v. M'Faddon*, 11 U.S. (7 Cranch) 116, 3 L.Ed. 287 (1812). Where neither the Constitution nor Congress grants a right, it is inappropriate to invent and perpetuate it by judicial fiat. *See, e.g.*, Jay Conison, *What Does Due Process Have to Do With Jurisdiction?*, 46 RUTGERS L. REV. 1071 (1994).

**2. A FOREIGN STATE WHICH CAUSES THE PERSONAL INJURY OR DEATH OF A UNITED STATES NATIONAL THROUGH AN ACT OF STATE–SPONSORED TERRORISM HAS "MINIMUM CONTACTS" WITH THE UNITED STATES.**

Even if foreign states are invariably "persons" for the purposes of Constitutional Due Process analysis, Constitutional requirements have been met in this case. In *International Shoe Co. v. Washington*, the Supreme Court expressly rejected a rigid formula for discerning the contacts necessary to satisfy due process. 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945). The reluctance to establish a minimum threshold of contacts based upon abstractions has persisted; "'[d]ue process,' unlike some legal

---

**8.** The House Report expressly states that the provisions are identical. H.Rep. 94-1487 at 25-26, *reprinted at* 1976 U.S.C.C.A.N. at 6624-25. *Compare* Fed.R.Civ.P. 12(a)(3) *and* 28 U.S.C. § 1608(d) (time to answer); Fed.R.Civ.P. 55(e) *and* 28 U.S.C. § 1608(e) (requirements for entry of default judgment).

**9.** This conclusion applies not only to the foreign state, but also to the foreign state's agents officials and employees for acts performed in their official capacity. *See, e.g., Matter of Reserves Development Corp.*, 78 B.R. 951 (W.D.Mo.1986). The argument against Constitutional Due Process protections may in fact be even stronger in the case of foreign state officials; aliens outside the United States are not entitled to Constitutional protection, even in the criminal context. *See Air Line Stewards and Stewardesses Ass'n, Intern. v. Northwest Airlines, Inc.*, 162 F.Supp. 684 (D.Minn.1958).

rules, is not a technical conception with a fixed content unrelated to time, place and circumstances." *Cafeteria and Restaurant Workers Union, Local 473 v. McElroy,* 367 U.S. 886, 895, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961). Each case requires evaluation in light of its own unique facts and circumstances, in order to ensure that the exercise of jurisdiction complies with "fair play and substantial justice." *International Shoe,* 326 U.S. at 316.

The Supreme Court has recognized that "reasonableness considerations sometimes serve to establish the reasonableness of jurisdiction upon a lesser showing of minimum contacts than would otherwise be required." *Burger King v. Rudzewicz,* 471 U.S. 462, 483–84, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985). In a case evaluating a statute designed to implement United States policy to curb terrorism, the Court of Appeals for the District of Columbia Circuit stated that given "the broad discretion granted to the executive branch in foreign policy matters, appellants misstate the degree of [procedural due] process due . . . ." *Palestine Information Office v. Shultz,* 853 F.2d 932, 942 (D.C.Cir. 1988) (discussing the Foreign Missions Act). The Court held that while policy interests would never completely supplant the Due Process Clause, some areas were so committed to the political branches, such as foreign policy, that a statute implementing that policy could significantly lower the threshold of constitutional requirements, so long as there existed other processes to protect the defendant's interests.

Prior to the state sponsored terrorism amendments, the lingering effects of personal injury incurred overseas and continuing in the United States did not satisfy the requirements, usually under the commercial activities section, that the effects of the act be "direct." *See Princz,* 26 F.3d 1166; *Martin v. Republic of South Africa,* 836 F.2d 91 (2nd Cir.1987). *See also Persinger v. Islamic Republic of Iran,* 729 F.2d 835 (D.C.Cir.1984) (U.S. Marine barracks overseas not within the United States for purposes of 28 U.S.C. § 1605(a)(5)). The state sponsored terrorism exception, however, provides an express jurisdictional nexus based upon the victim's United States nationality. *See* 28 U.S.C. § 1605(a)(7)(B)(ii). The Departments of State and Justice have determined that

> the legislation ensures that, where United States courts assume jurisdiction over a foreign sovereign, there is a nexus to the United States. This limitation balances the United States' interest in providing a forum for American victims of specified outrageous conduct against the interest of foreign governments in not being forced to defend actions with no connections to the United States.

Brief of the United States as Amicus Curiae at 27–28, *Pan Am 103,* 101 F.3d 239 (2d Cir.1996).[10] This reading is consistent with that of the Supreme Court in *Verlinden,* that Congress "enact[e]d [in the FSIA] substantive provisions requiring some form of substantial contact with the United States." 461 U.S. at 490.

When a state has been designated a state sponsor of terrorism and has been subject to economic sanctions, including an international boycott, for almost 14 years, there inherently will be very few contacts with the foreign states and its officials, as typically conceived in the commercial context. However, this case is brought against the Islamic Republic of Iran and its officials for actions in its sovereign capacity. Sovereign contacts, therefore, should be sufficient to sustain general jurisdiction over Defendants, at least for the purposes of 28 U.S.C. § 1605(a)(7). Even commercial actions under the FSIA embrace the concept of nationwide contacts. *See Meadows v. Dominican Republic,* 817 F.2d 517 (9th Cir.1987); *Ruiz v. Transportes Aereos Militares Ecuadorianos,* 103 F.R.D. 458 (D.D.C.1984). The contacts between Interpol and the Department of Justice in the course of performing international criminal investigations have

---

**10.** The main issue on appeal was whether violations of *jus cogens* were an implied waiver of sovereign immunity in United States courts within the meaning of 28 U.S.C. § 1605(a)(1); the United States argued as *Amicus Curiae* against a finding of implied waiver. The Brief was filed on June 12, 1996, after the enactment of the Antiterrorism Act, but prior to the enactment of the Flatow Amendment.

been held to generate sufficient contacts to support personal jurisdiction over Interpol for a defamation action in United States Courts. *Steinberg v. International Criminal Police Organization*, 103 F.R.D. 392 (D.D.C.1984).

Even in the absence of diplomatic relations, states actors, as a matter of necessity, have substantial sovereign contact with each other. They inherently interact as state actors in the international community and as members of the United Nations—the suspension of diplomatic relations has more political than practical ramifications, as the states will maintain unofficial contact through "interest sections" under the auspices of another state's "protecting power."Apolitical functions, such as service of process in this matter, continue to operate, albeit in a more circuitous fashion, through such contacts. This Court concludes that even if a foreign state is accorded the status of a "person" for the purposes of Constitutional Due Process analysis, a foreign state that sponsors terrorist activities which causes the death or personal injury of a United States national will invariably have sufficient contacts with the United States to satisfy Due Process.

### 3. FAIR PLAY AND SUBSTANTIAL JUSTICE REQUIRE THAT UNITED STATES COURTS EXERCISE JURISDICTION OVER FOREIGN STATE SPONSORS OF TERRORISM WHOSE SPONSORSHIP RESULTS IN THE DEATH OR PERSONAL INJURY OF UNITED STATES NATIONALS.

The emphasis of the Due Process analysis required for jurisdiction pursuant to 28 U.S.C. § 1605(a)(7) is most properly focused on the evaluation of fair play and substantial justice. *See, e.g., International Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95.

All states are on notice that state sponsorship of terrorism is condemned by the international community. United States policy towards state sponsors of terrorists, has been made abundantly clear since the 1979–1981 hostage crisis in Tehran and the ensuing suspension of diplomatic relations with

and establishment of international boycotts against foreign state sponsors of terrorism. Foreign state sponsors of terrorism could not reasonably have expected that the United States would not respond to attack on its citizens, and not undertake measures to prevent similar attacks in the future. In light of the mounting Congressional frustration at the inability of United States victims of foreign state abuses to obtain relief from any forum, it is manifest that Congress enacted 28 U.S.C. § 1605(a)(7) to ensure fair play and substantial justice for American victims of state sponsored terrorism.

As terrorism has achieved the status of almost universal condemnation, as have slavery, genocide, and piracy, and the terrorist is the modern era's *hosti humani generis*—an enemy of all mankind, this Court concludes that fair play and substantial justice is well served by the exercise of jurisdiction over foreign state sponsors of terrorism which cause personal injury to or the death of United States nationals.

### D. FED. R. CIV. P. 12(b)(6) DEFENSES

Usually Fed.R.Civ.P. 12(b)(6) defenses are considered taking the facts in a light most favorable to the non-moving party. *Campbell–El v. District of Columbia*, 881 F.Supp. 42, 43 (D.D.C.1995). However, because Defendants have defaulted, this Court has already made its findings of fact in Section II, *supra*. On the basis of those findings of fact, this Court concludes as a matter of law that, for the following reasons, Defendants could not sustain a successful Fed.R.Civ.P. 12(b)(6) defense to this action.

### 1. STATUTE OF LIMITATIONS

The state sponsored terrorism provision provides a ten-year statute of limitations, and provides for equitable tolling of limitations of actions. 28 U.S.C. § 1605(f). This Court therefore concludes as a matter of law that the earliest possible date for the statute of limitations to expire for any action brought pursuant to 28 U.S.C. § 1605(a)(7) and 28 U.S.C.A. § 1605 note will be April 24, 2006.

## 2. ACT OF STATE DOCTRINE

The Act of State Doctrine generally precludes review by United States courts of official acts by foreign states. *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964); *Alfred Dunhill of London v. Republic of Cuba*, 425 U.S. 682, 691 n. 7, 96 S.Ct. 1854, 48 L.Ed.2d 301 (1976), *quoting Underhill v. Hernandez*, 168 U.S. 250, 252, 18 S.Ct. 83, 42 L.Ed. 456 (1897). The doctrine applies, however, only with respect to actions taken within the foreign state's own territory. *Sabbatino*, 376 U.S. at 423. Although the acts complained of may have occurred within the foreign state defendant's territory, such acts will not invoke the Act of State Doctrine.

> Although the acts allegedly undertaken directly by the Republic of Chile to obtain the death of Orlando Letelier may well have been carried out entirely within that country, that circumstance alone will not allow it to absolve itself under the act of state doctrine if the actions of its alleged agents resulted in tortious injury in this country. To hold otherwise would be to emasculate the purpose and effectiveness of the Foreign Sovereign Immunities Act by permitting a foreign state to reimpose the so recently supplanted framework of sovereign immunity as defined prior to the Act " 'through the back door, under the guise of the act of state doctrine.' "

*Letelier*, 488 F.Supp. at 674 (citations omitted).

Additionally, an act of state must also be valid in order for this court to decline to exercise jurisdiction pursuant to the Act of State doctrine; however, valid is not necessary synonymous with either United States law or general principles of international law. An act which is acknowledged to be within a state's discretion, although it violates federal and international law, can still be a valid act for the purposes of the Act of State doctrine, such as assisting an intrafamilial kidnapping by issuing a travel visa. *Risk v. Halvorsen*, 936 F.2d 393 (9th Cir.1991). Political assassinations ordered by foreign states outside their territory, however, are not valid acts of state which bar consideration of the case. *See, e.g., Liu*, 892 F.2d at 1432–34; *Letelier*,

488 F.Supp. at 673–74. This Court concludes that bus bombings and other acts of international terrorism are not valid acts of state of the type which bar consideration of this case, nor was the bombing complained of perpetrated within the Islamic Republic of Iran; therefore the defense of the Act of State Doctrine is not available.

## 3. HEAD OF STATE IMMUNITY

Like foreign sovereign immunity, head of state immunity is a matter of grace and comity, rather than a matter of right. *Lafontant v. Aristide*, 844 F.Supp. at 132, *citing Hilton v. Guyot*, 159 U.S. 113, 163–164, 16 S.Ct. 139, 40 L.Ed. 95 (1895). Only individuals whom the United States recognizes as legitimate heads of state qualify; whether an individual qualifies as a head of state is a decision committed exclusively to the political branches and the judiciary is bound by their determinations. *Id.* at 132–133, *citing Sabbatino*, 376 U.S. at 410. *See also United States v. Noriega*, 746 F.Supp. 1506 (S.D.Fla.1990); *United States v. Pink*, 315 U.S. 203, 230, 62 S.Ct. 552, 86 L.Ed. 796 (1942).

The Flatow Amendment overrides the common law doctrine of head of state immunity, as it expressly provides for the application of 28 U.S.C. § 1605(a)(7)'s exception to immunity to "[a]n official, employee, or agent of a foreign state ... acting within the scope of his or her office, employment, or agency." This provision was directed at those individuals who facilitate terrorist acts which cause the injury or death of American citizens. The provision does not qualify or in any way limit its application only to non-heads of state. Given that state sponsorship of terrorism is a decision made at the highest levels of government, unless the Flatow Amendment is interpreted as abrogating head of state immunity under the limited circumstances of 28 U.S.C. § 1605(a)(7), the provisions cannot give full effect to Congressional intent, and the federal cause of action created by the two amendments would be irreparably and unreasonably hobbled. This Court therefore concludes that the defense of head of state immunity is not available in

actions brought pursuant to 28 U.S.C. § 1605(a)(7) and 28 U.S.C.A. § 1605 note.

### 4. FORUM NON CONVENIENS

Congress specifically created a certain forum in the United States for United States victims of state sponsored terrorism, because even in the rare instance where there would be an adequate alternate forum for such a case, the interests of the United States in ensuring that its citizens have an opportunity to seek redress in the United States is paramount, and will inevitably exceed the interests of any other fora. *See, e.g.,* Saxton News Release. The judiciary cannot properly decline to decline jurisdiction on the basis of *forum non conveniens* for actions brought pursuant to 28 U.S.C. § 1605(a)(7) where the political branches of government charged with balancing foreign relations and the interests of its nationals have unambiguously spoken.

■ This Court therefore concludes that as a matter of law, the defense of *forum non conveniens* is not available in actions brought pursuant to 28 U.S.C. § 1605(a)(7).

### 5. PUNITIVE DAMAGES

### a. FOREIGN STATE SPONSORS OF TERRORISM ARE SUSCEPTIBLE TO PUNITIVE DAMAGES.

■ Prior to the state sponsored terrorism amendments, the FSIA absolutely prohibited the award or recovery of punitive damages against the foreign state itself. *See* 28 U.S.C. § 1606; *Letelier v. Republic of Chile,* 502 F.Supp. 259 (D.D.C.1980) (judgment). The Flatow Amendment, however, departs from the prior enactment by expressly providing a cause of action for punitive damages for state sponsored terrorism. No other provision of the FSIA expressly states the nature of remedies available, because the FSIA as otherwise enacted is not intended to affect the substantive law of liability so as to affect the primary conduct of foreign states. *See cases pre-dating the Flatow Amendment, e.g., First National City Bank,* 462 U.S. at 619–20; *Liu,* 892 F.2d at 1425.

The state-sponsored terrorism exception, however, was enacted explicitly with the intent to alter the conduct of foreign states, particularly towards United States nationals traveling abroad. Congressman Saxton, the Chairman of the House Task Force on Counterterrorism and Unconventional Warfare, was convinced that the only way to accomplish this goal was to impose massive civil liability on foreign state sponsors of terrorism whose conduct results in the death or personal injury of United States citizens. As compensatory damages for wrongful death cannot approach a measure of damages reasonably required for a foreign state to take notice, Congressman Saxton sponsored the Flatow Amendment in order to make the availability of punitive damages indisputable. *See* Saxton, News Release; *see also* 2 SUTHERLAND ON STATUTORY CONSTRUCTION at § 48.16 *citing Brock v. Pierce County,* 476 U.S. 253, 106 S.Ct. 1834, 90 L.Ed.2d 248 (1986).

### b. PUNITIVE DAMAGES AWARDED AGAINST A FOREIGN STATE'S OFFICIALS, AGENTS AND EMPLOYEES FOR THE PROVISION OF MATERIAL SUPPORT AND RESOURCES TO A TERRORIST GROUP WHOSE ACTS RESULT IN THE PERSONAL INJURY OR WRONGFUL DEATH OF A UNITED STATES NATIONAL CAN BE IMPUTED TO THE FOREIGN STATE.

The FSIA is not intended to affect the substantive law of liability or the attribution of liability between co-defendants. *See* H.REP. 94–1487 at 12, *reprinted at* 1976 U.S.C.C.A.N. at 6610; *First National City Bank,* 462 U.S. at 619–20 (discussing agencies and instrumentalities); *see also* Note, *When May a Sovereign Be Held Liable for the Acts of Her Instrumentalities Under the Foreign Sovereign Immunities Act? The Effect of the McKesson Decision,* 1 TULSA J. COMP. & INT'L L. 285 (1994). Even if 28 U.S.C. § 1606 applies to causes of action brought directly against a foreign state pursuant to the state sponsored terrorism exception to immunity and the Flatow Amendment, a foreign state sponsor of terrorism can still be

indirectly liable for punitive damages under the principles of *respondeat superior* and vicarious liability.

■ Individuals acting in their official capacities are considered subject to the FSIA pursuant to 28 U.S.C. § 1603(b), as "agencies or instrumentalities" of the foreign state. *See generally* Joan Fitzpatrick, *The Claim to Foreign Sovereign Immunity by Individuals Sued for International Human Rights Violations,* 15 WHITTIER L. REV. 465 (1994). Not one court has held that a foreign state official acting in an official capacity is a "foreign state" within the meaning of 28 U.S.C. § 1603(a). Furthermore, the Flatow Amendment expressly provides that money damages, including punitive damages, are available in actions against a foreign state's agents, officials and employees who perform acts which invoke jurisdiction pursuant to the state sponsored terrorism exception to the FSIA. 28 U.S.C.A. § 1605 note. This Court concludes that an individual acting within the scope of his or her agency, office, or employment is therefore susceptible to causes of action for punitive damages.

■ The Flatow Amendment expressly provides that punitive damages are available against the agents of a foreign state, but does not limit the term "agent" to an individual, non-governmental actor. A governmental unit of a foreign state can act as an agent of the foreign state, if, for example, it acts with the authority of the government, but not within the scope of its dedicated function. This Court concludes that in order for a cause of action for punitive damages to lie against a governmental unit acting as the state's agent, the cause of action must be based not upon any alleged role as a policymaker, but rather upon its implementation of policy at the operational level. Nevertheless, whether the intelligence service of a foreign state should be considered part of the "foreign state" itself, or its "agency or instrumentality" for the purposes of the FSIA, is an issue of first impression. *But see Trajano v. Marcos,* 978 F.2d 493, 497 (whether Philippine Military Intelligence was an "agency or

instrumentality" raised by defense but not addressed by the Court). A foreign state's intelligence service most closely meets 28 U.S.C. § 1603(b)'s definition of an "agency or instrumentality" as: a separate legal person which is neither a citizen of a State of the United States nor created under the laws of a third country; an organ of a foreign state; operated by public employees paid by the foreign state; and occupying a unique role defined and granted by the government. *See Corporacion Mexicana De Servicios Maritimos, S.A. v. M/T RESPECT,* 89 F.3d 650, 654–55 (9th Cir.1996); *Intercontinental Dictionary Series v. De Gruyter,* 822 F.Supp. 662, 673 (C.D.Cal.1993). *But see Transaero, Inc. v. La Fuerza Aerea Boliviana,* 30 F.3d 148, 151–53 (D.C.Cir.1994), *cert. denied,* 513 U.S. 1150, 115 S.Ct. 1101, 130 L.Ed.2d 1068 (1995).

The Ninth Circuit has held that the " 'scope of employment' provisions of the tortious activity exception [28 U.S.C. § 1605(a)(5)] essentially requires a finding that the doctrine *of respondeat superior* applies to the tortious acts of individuals." *Joseph,* 830 F.2d at 1025, *quoted in Liu,* 892 F.2d at 1425. A variation of *respondeat superior,* command responsibility, has formed the basis of judgments against high-ranking foreign military officers under the Torture Victim Protection Act. *See Hilao,* 103 F.3d at 776–77; *Kadic,* 70 F.3d at 242; *Paul,* 901 F.Supp. at 335; *Xuncax,* 886 F.Supp. at 170. *See also In re Yamashita,* 327 U.S. at 14; *Forti,* 672 F.Supp. at 1537–38.

The state sponsored terrorism exception to immunity and the Flatow Amendment similarly employ the principles of *respondeat superior* and command responsibility to create both subject matter jurisdiction and a federal cause of action. The operative language of 28 U.S.C. § 1605(a)(7)[11] parallels the definition of *respondeat superior:* an employer is liable in some cases for damages "proximately resulting from acts of employee done within scope of his employment in the employer's service." BLACK'S LAW DICTIONARY at 1311–1312 (6th ed.1990). The Flatow Amendment

---

11. 28 U.S.C. § 1605(a)(7): "if such act or provision of material resources is engaged in by an official, employee or agent of such foreign state while acting within the scope of his office, employment or agency."

employs similar language to identify actionable conduct. If a plaintiff can establish subject matter jurisdiction pursuant to 28 U .S.C. § 1605(a)(7), this Court concludes that the principal's vicarious liability will attach pursuant to 28 U.S.C.A. § 1605 note.

■ Sponsorship of terrorist activities inherently involves a conspiracy to commit terrorist attacks. As a co-conspirator, both with its own agents, officials and employees, and with others, such as the terrorist organization and the ultimate perpetrators, the foreign state is also a joint tortfeasor. As the FSIA was not intended to affect the substantive law of liability, and in particular the allocation of liability, this Court concludes that a foreign state sponsor of terrorism is jointly and severally liable for all damages assessed against co-defendant officials, agents, and employees.

**c. PUNITIVE DAMAGES MAY BE AWARDED IN CASES ARISING FROM PRE–ENACTMENT CONDUCT BY FOREIGN STATE SPONSORS OF TERRORISM.**

■ Because 28 U.S.C. § 1605(a)(7) and 28 U.S.C.A. § 1605 note are read *in pari materia*, the enumerated bases for money damages, including punitive damages, in the Flatow Amendment are deemed to relate back to the state sponsored terrorism exception to immunity. *See* 1A SUTHERLAND ON STATUTORY CONSTRUCTION §§ 22.31–36. For substantially the same reasons set forth in the subject matter jurisdiction discussion at part III(A)(2),(4) *supra*, the Flatow Amendment, 28 U.S.C.A. § 1605 note, applies to pre-enactment extraterritorial conduct by foreign states.[12] The Flatow Amendment, like the state sponsored terrorism exception

to immunity, is remedial; both merely "add[ ] to the means of enforcing existing obligations." *Id.* at § 41.09. Even statutes which permit recovery in excess of compensatory damages are not automatically penal in nature. The primary purpose of 28 U.S.C. § 1605(a)(7) and 28 U.S.C.A. § 1605 note, *in pari matiera*, is to create a remedy for United States citizen victims of foreign state sponsored terrorism. The secondary effect of deterring terrorism through the imposition of punitive damages does not prohibit application of the Flatow Amendment to pre-enactment conduct. *See* 3 SUTHERLAND ON STATUTORY CONSTRUCTION at § 60.04–05.

**II. CONCLUSIONS OF LAW WITH RESPECT TO LIABILITY AND DAMAGES**

**A. WRONGFUL DEATH**

The recent amendments to the FSIA, 28 U.S.C. § 1605(a)(7) and 28 U .S.C.A. § 1605 note, establish a cause of action for wrongful death proximately caused by an act of state sponsored terrorism. Although the FSIA does not define the scope of this new federal cause of action, typically, a wrongful death statute is designed to compensate decedent's heirs-at-law for economic losses which result from decedent's premature death. *See, e.g.,* D.C. CODE ANN. § 16–2701 (Michie 1981); *see also Alejandre v. Republic of Cuba,* 996 F.Supp. 1239, 1249–50 (S.D.Fla.1997).

There are two separate items of economic loss resulting from the death of Alisa Michelle Flatow, the funeral expenses and the loss of accretions to her Estate.

The funeral bill in the amount of $4,470.00 was introduced into evidence. The Court notes that various costs associated with the

---

12. The same statute of limitations and discovery limitations expressly apply to 28 U.S.CA. § 1605 note as to 28 U.S.C. § 1605(a)(7); there is no basis to imply that Congressional intent regarding 28 U.S.C.A. § 1605 note's application to pre-enactment conduct would be any different. *See* 28 U.S.C.A. § 1605 note at § (b)(1).

The only plausible basis for a Constitutional challenge, Due Process, must fail. The state sponsored terrorism exception and the Flatow Amendment represent a valid exercise of police power by the federal government, which cannot

lack Due Process. 2 SUTHERLAND ON STATUTORY CONSTRUCTION at § 41.06 n. 45 *citing Weaver v. Graham,* 450 U.S. 24, 101 S.Ct. 960, 67 L.Ed.2d 17 (1981) ("the use of such powers by the government is itself a way of exercising and affording due process of law.") Furthermore, a state has "no vested right to nonliability for injuries caused by public officers before the enactment of a statute permitting recovery." *Id.* at § 41.06 n. 37 *citing Evans v. Berry,* 262 N.Y. 61, 186 N.E. 203 (1933).

death and final services were undertaken by the United States government and the government of the State of Israel, for which there exist no appraisal or other method to determine an accurate figure. The Court finds that the funeral bill amount set forth above is reasonable and the services detailed are those anticipated for final services.

The Plaintiff also introduced testimony from Dr. Jerome S. Paige with regard to loss of accretions to the Estate. His testimony as to a projected professional profile for Alisa Michelle Flatow, had she lived, was supported in great detail by her professor and mentor at Brandeis University, Dr. Jonathan D. Sarna, and this testimony was in turn corroborated by her classmates Alan Mitrani and Lauren Sloane, as well as by Plaintiff Stephen M. Flatow and the decedent's sister, Francine Flatow. Finally, the Plaintiff introduced into evidence the records for the decedent Alisa Michelle Flatow from Brandeis University, which indicated that she was a Dean's List student throughout her college career. The Court finds absolutely no reason to doubt any particulars of this testimony.

The testimony of Dr. Paige reviewed the methodology of calculation of economic loss, which the Court finds to be appropriate, including the assumptions as to inflation, rise in productivity, job advancement, personal consumption, and net earnings. Further, the discount rate applied by Dr. Paige appears to the Court to be extremely conservative, as it is based upon risk-free securities over an extended period of time, as detailed by official United States Department of the Treasury publications. The discount rate applied varies from 5.53% to 5.89%. Although Dr. Paige computed the net economic loss on the basis of both typical mean earnings with a Master's degree and with a Master's Degree in physical/occupational therapy, the Court finds that given the overwhelming body of testimony indicating that Alisa Michelle Flatow would have become a physical/occupational therapist, a calculation based upon that assumption is more appropriate.

■ Applying these factors, the Court finds that value of the loss of accretions to the Estate of Alisa Michelle Flatow of $1,207,000.00, given by Dr. Paige, is reasonable. As indicated by Dr. Paige, this figure must be factored by an estimate of Alisa Michelle Flatow's increased earnings potential, given her exceptional academic performance. The Court finds that the minimal adjustment which should be made to the loss of accretions based upon ample evidence of Alisa Michelle Flatow's superior academic performance would be a 25% increase, thereby yielding a total loss of $1,508,750.00.

Accordingly, the total amount of economic damages proven by clear and convincing evidence in this case is $1,513,220.00.

## B. SURVIVAL DAMAGES—PAIN AND SUFFERING

■ Causes of action which could have been brought by the decedent but for decedent's death may be asserted for the benefit of the Estate. *See, e.g.,* D.C. CODE ANN. § 12–101 (Michie 1981). Such actions are separate and distinct from any claim of wrongful death by decedent's heirs-at-law, *Hoston v. United States,* 566 F.Supp. 1125 (D.D.C.1983). Redundant recovery may not be had under both wrongful death and survival statutes. *Runyon v. District of Columbia,* 463 F.2d 1319 (D.C.Cir.1972). If Plaintiff presents sufficient evidence of conscious pain and suffering, determination of the compensation has largely been relegated to the discretion of the trier of fact by courts in this jurisdiction based upon factors including the duration and nature of the suffering endured. The United States Court of Appeals for the District of Columbia Circuit has firmly established that the trier of fact has broad discretion in calculating damages for pain and suffering. *Taylor v. Washington Terminal Co.,* 133 U.S.App. D.C. 110, 409 F.2d 145, *cert. denied,* 396 U.S. 835, 90 S.Ct. 93, 24 L.Ed.2d 85 (1969).

The Plaintiff in this action has elicited extensive testimony on the extent of pain and suffering resulting from the acts above described. Testimony by witness Kesari Rusa, who was seated next to Alisa Michelle Flatow on the bus, described clutching of Alisa Michelle Flatow's hands following the explosion, at which time her eyes were open. The

videotape taken at the scene depicts witness David Shaenbaum assisting with the administration of fluids as a part of treatment on the scene, at which time no breathing assistance or resuscitation efforts were necessary. The records of the Soroka Medical Center indicate that upon arrival Alisa Michelle Flatow demonstrated a strong pulse and independent respiration. Indeed, breathing assistance was initiated only as a part of the surgical procedures which followed. Alisa Michelle Flatow was responsive to external pain stimuli and her pupils reacted to light until the early evening hours. These facts are demonstrated both by the medical records and by the testimony of Dr. Allen Fisher, the attending physician. Further, the testimony of Dr. Gregory Threatte included his opinion as a pathologist that conscious pain and suffering continued for at least three to five hours.

██ This Court finds that the above-referenced testimony is credible and convincing. This Court further finds that an appropriate amount of compensatory damages for Alisa Michelle Flatow's pain and suffering is $1,000,000.00.

### C. SOLATIUM

The 1996 amendments to the Foreign Sovereign Immunities Act of 1976 ["FSIA"] included solatium as an element of compensatory damages where physical injury or death results from state sponsored terrorism. *See* 28 U.S.C. § 1605(a)(7) and 28 U.S.C.A. § 1605 note. Although almost all civil law jurisdictions, including Louisiana and Puerto Rico, have long included solatium in wrongful death actions, this concept has not been accepted by the local Courts of this jurisdiction. *See e.g., Runyon,* 463 F.2d 1319; *Joy v. Bell Helicopter Textron, Inc.,* 999 F.2d 549 (D.C.Cir.1993); *Saunders v. Air Florida, Inc.,* 558 F.Supp. 1233 (D.D.C.1983). To date, only one Court has issued a judgment pursuant to these new provisions, and that Court did not enumerate the bases for its calculation of damages. *See, e.g., Alejandre* at 1249–50. As this Court considers claims for solatium only in rare cases involving the law of other jurisdictions, it is appropriate to review practice in other jurisdictions with respect to solatium in order to determine the appropriate scope of this new federal cause of action pursuant to 28 U.S.C. § 1605(a)(7) and 28 U.S.C.A. § 1605 note.

The first wrongful death statute at common law, Lord Campbell's Act, 9 and 10 Vict. C.93 § 1 (1846), limited recoveries to economic losses. The expansion of wrongful death damages to include sentimental as well as economic losses did not take hold until after the Industrial Revolution, at approximately the same time the concept of children as chattel whose labor was owned by their parents waned. *See Damages—Death of Child,* 45 A.L.R.4th 234 § 2(a). The result of this gradual and relatively recent shift is that the scope of solatium varies tremendously from state to state. *See generally, id.; Death: Damages for Wrongful Death,* 22A AmJur2d §§ 215–385; *Relationship Between Victim and Plaintiff-Witness as Affecting Right to Recover Damages in Negligence for Shock or Mental Anguish at Witnessing Victim's Injury of Death,* 94 ALR3d 486; *Recovery of Damages for Loss of Consortium Resulting from Death of Child—Modern Status,* 77 A.L.R.4th 411; *Excessiveness and Adequacy of Damages for Personal Injuries Resulting in Death of Minor,* 49 A.L.R.4th 1076; *Damages—Child's Death or Injury,* 61 A.L.R.4th 413.

██ This action has been brought for the benefit of decedent Alisa Michelle Flatow's parents, sisters and brother. Under 28 U.S.C.A. § 1605 note, United States nationals or their legal representatives have standing to bring a cause of action for damages including solatium where personal injury or death results from state sponsored terrorism. The statute does not, however, define the range of individuals who may be entitled to solatium. Solatium is traditionally a compensatory damage which belongs to the individual heir personally for injury to the feelings and loss of decedent's comfort and society. It began as a remedy for the loss of a spouse or a parent. It has since expanded to include the loss of a child, including in some states the loss of an emancipated or adult child. *Reiser v. United States,* 786 F.Supp.

1334 (N.D.Ill.1992).[13] Where the claim is based upon the loss of a sibling, the claimant must prove a close emotional relationship with the decedent. *Miles v. Apex Marine Corp.*, 498 U.S. 19, 111 S.Ct. 317, 112 L.Ed.2d 275 (1990); *Reiser*, 786 F.Supp. 1334.

■ Solatium is defined as "Compensation. Damages allowed for injury to feelings." BLACK'S LAW DICTIONARY 1391 (6th ed.1990). Thus mental anguish, bereavement and grief resulting from the fact of decedent's death constitutes the preponderant element of a claim for solatium. Although most courts have not enumerated the bases for their calculations, some courts have indicated what factors· entered into the judgment. As damages for mental anguish are extremely fact-dependent, claims require careful analysis on a case-by-case basis.

It is entirely possible to come to terms with the fact of death, and yet be unable to resolve the sense of anguish regarding the circumstances of death. This is particularly true where the death was sudden and violent.[14] *See, e.g., Dugal v. Commercial Standard Ins. Co.*, 456 F.Supp. 290 (W.D.Ark. 1978); *St. Louis S.R. Co. v. Pennington*, 261 Ark. 650, 553 S.W.2d 436 (1977); *Scoville v. Missouri Pacific R. Co.*, 458 F.2d 639 (8th Cir.1972). How the claimant learned of decedent's death, and whether there was an opportunity to say good-bye or view the body can be a significant factor contributing to the claimant's anguish. In one case a decedent's father saw the plane crash into the building in which his 15–year–old son was working, as well as the resulting fireball which thwarted rescue attempts. The boy's mother was speaking with him on the telephone at the time of impact and heard him die. *Compania Dominicana de Aviacion v. Knapp*, 251 So.2d 18 (Fla.App. 3Dist.1971). Similarly, when advanced medical technology permits the victim's body to survive the event, but

without hope of recovery, the decision whether to continue such extraordinary measures or to terminate life support will to some degree always haunt the decision-makers, particularly where, as here, the decision to terminate life support must be implemented by a claimant.

*Knapp* and similar cases, however, spring almost exclusively from negligence. Even where the death results from the most extreme forms of negligence, the primary visceral reaction is to the tragedy. This is not the case with deaths resulting from terrorist attacks, in which the tragedy itself is amplified by the malice which inspired the event. The malice associated with terrorist attacks transcends even that of premeditated murder. The intended audience of a terrorist attack is not limited to the families of those killed and wounded or even just Israelis, but in this case, the American public, for the purpose of affecting United States government support for Israel and the peace process. The terrorist's intent is to strike fear not only for one's own safety, but also for that of friends and family, and to manipulate that fear in order to achieve political objectives. Thus the character of the wrongful act itself increases the magnitude of the injury. It thus demands a corresponding increase in compensation for increased injury.

Spouses and relatives in direct lineal relationships are presumed to suffer damages for mental anguish. The testimony of sisters or brothers is ordinarily sufficient to sustain their claims for solatium. *See Reiser*, 786 F.Supp. 1334. Proof relies predominantly on the testimony of claimants, their close friends, and treating medical professionals, as appropriate. *See Alejandre* at 1249–50; 61 A.L.R.4th 413 at § 13. Obvious distress during testimony, or the claimant's inability to testify due to intense anguish is usually considered in fixing the amount for solatium.

**13.** *See also* 77 A.L.R.4th 411 §§ 6,8, 9; 22A Am Jur2d at § 277 n. 13–19; 61 A.L.R.4th 413 at § 7 (citing cases):

*recovery for solatium resulting from death of adult emancipated child permitted:* Arkansas, California, Colorado, Hawaii, Illinois, Kansas, Louisiana, Maine, Maryland, Missouri, Nebraska, Texas, Utah, Virginia, Washington, Wisconsin;

*recovery for solatium resulting from death of child limited to period of child's minority:* Florida, Kentucky, Indiana, Iowa, Michigan, Oregon, Pennsylvania.

**14.** 61 A.L.R.4th 413 at § 20 (citing cases where the courts have considered the violent manner of death as a factor in calculating damages for mental anguish): Arkansas, Missouri, Florida.

*See, e.g., Jeffery v. United States*, 381 F.Supp. 505 (D.Ariz.1974). Testimony which describes a general feeling of permanent loss or change caused by decedent's absence has been considered a factor to be taken into account in awarding damages for solatium. *See Wheat v. United States*, 630 F.Supp. 699 (W.D.Tex.1986); *Brownsville Med. Center v. Gracia*, 704 S.W.2d 68 (Tex.App.Corpus Christi 1985). Medical treatment for depression and related affective disorders is another strong indicator of mental anguish. The body may also react to the stress of anguish with pain or illness, particularly stomach and chest pain, and documentation of such disorders are germane to the calculation of solatium.

Courts have also recognized that in the long term, the sudden death of a loved one may manifest itself as "a deep inner feeling of pain and anguish often borne in silence." *Connell v. Steel Haulers, Inc.*, 455 F.2d 688 (8th Cir.1972). Individuals can react very differently even under similar circumstances; while some sink into clinical depression and bitterness, others attempt to salvage something constructive from their personal tragedy. Such constructive behavior should not be considered as mitigating solatium, but rather as an equally compensable reaction, one in which courage to face their own mental anguish prevails in order to survive, and in some circumstances, to benefit another.

A separate loss which is encompassed within solatium is the loss of decedent's society and comfort. Originally, wrongful death acts provided compensation only for the decedent's lost cash income stream. The next evolutionary stage was to recognize the economic value of decedent's personal services to claimant, such as household maintenance and nursing care.[15] *See, e.g., Umphrey v. Deery*, 78 N.D. 211, 48 N.W.2d 897 (1951). Many jurisdictions have now expanded recovery for loss of comfort and society to include all benefits which the claimant would have received had decedent lived. *Schaefer v. American Family Mut. Ins. Co.*, 182 Wis.2d 380, 514 N.W.2d 16 (Wis.App.1994). "Society" has evolved to include "a broad range of mutual benefits which 'each family member' receives from the other's continued existence, including love, affection, care, attention, companionship, comfort and protection."[16] *Miles v. Apex Marine Corp.*, 498 U.S. 19, 111 S.Ct. 317, 112 L.Ed.2d 275.

The calculations for mental anguish and loss of society share some common considerations. First, the calculation should be based upon the anticipated duration of the injury. Claims for mental anguish belong to the claimants and should reflect anticipated persistence of mental anguish in excess of that which would have been experienced following decedent's natural death. When death results from terrorism, the fact of death and the cause of death can become inextricably intertwined, thus interfering with the prospects for anguish to diminish over time. *Cf. Larrumbide v. Doctors Health Facilities*, 734 S.W.2d 685 (Tex.App.Dallas 1987).

The nature of the relationship between the claimant and the decedent is another critical factor in the solatium analysis. If the relationship is strong and close, the likelihood that the claimant will suffer mental anguish and loss of society is substantially increased, particularly for intangibles such as companionship, love, affection, protection, and guidance. Numerous factors enter into this analysis, including: strong emotional ties between the claimant and the

---

**15.** 22A AmJur2d at § 253 n. 48; 77 A.L.R.4th 411 at § 5; 61 A.L.R.4th 413 at § 4(b) (citing cases): Arkansas, Connecticut, Indiana, Massachusetts, Michigan, Mississippi, Missouri, New Hampshire, New Mexico, North Dakota, Ohio, Oregon, Pennsylvania. The Jones Act and the Death on the High Seas Act also preclude claims for loss of noneconomic damages, but general maritime law provides a remedy for the death of a longshoreman within territorial waters. *See, e.g., Miles v. Apex Marine Corp.*, 498 U.S. 19, 111 S.Ct. 317, 112 L.Ed.2d 275 (1990); *Sea–Land Services, Inc. v. Gaudet*, 414 U.S. 573, 94 S.Ct. 806, 39 L.Ed.2d 9, *reh'g denied* 415 U.S. 986, 94 S.Ct. 1582, 39 L.Ed.2d 883 (1974); 77 A.L.R.4th 411 at § 7; 22A AmJur2d Supp. at 23.

**16.** 77 A.L.R.4th 411 at §§ 4–5; 22A AmJur2d at §§ 252, 253 (citing cases): Alaska, Arizona, California, Idaho, Illinois, Indiana, Iowa, Louisiana, Michigan, Minnesota, Mississippi, Montana, Nebraska, New Jersey, New York, North Dakota, Pennsylvania, Rhode Island, South Carolina, South Dakota, Texas, Utah, Vermont Virginia, Virgin Islands, Washington.

decedent; decedent's position in the family birth order relative to the claimant; the relative maturity or immaturity of the claimants; whether decedent habitually provided advice and solace to claimants; whether the claimant shared interests and pursuits with decedent; as well as decedent's achievements and plans for the future which would have affected claimants.

Finally, unlike lost wages, which can be calculated with a fair degree of mathematical certainty, solatium cannot be defined through models and variables. Courts have therefore refused to even attempt to factor in the present value of future mental anguish and loss of society. While economic losses can be reduced to present value with simple equations to establish the amount of an annuity established today which would have matched the decedent's ostensible income stream, the scope and uncertainty of human emotion renders such a calculation wholly inappropriate. *Drews v. Gobel Freight Lines,* Inc. 144 Ill.2d 84, 161 Ill.Dec. 324, 578 N.E.2d 970 (1991); *United States v. Hayashi,* 282 F.2d 599 (9th Cir.1960). This is the paradox of solatium; although no amount of money can alleviate the emotional impact of a child's or sibling's death, dollars are the only means available to do so. *See, e.g., Walker v. St. Paul Ins. Co.,* 343 So.2d 251 (La.App.1977), *cert. denied* 345 So.2d 61 (La.1977).

■ The testimony before the Court described a closely-knit family in which the decedent, Alisa Michelle Flatow, occupied a special niche. The testimony of family, friends and her professor described a person of unique talents with an unusual sensitivity for other family members. Much of the religious orientation of the family seemed to spring from Alisa. To an extent and in a manner which is unique, the slaughter of Alisa Michelle Flatow inflicted pain upon the surviving members of that family. The magnitude of that suffering is demonstrated by the actions of the Flatow family in founding, administering and maintaining the Alisa Michelle Flatow Foundation, which has to date raised in excess of $200,000 for scholarships. The resort to this avenue as an expression of their feelings is, in the opinion of the Court, unique, praiseworthy, and of necessity, pro-

vides a basis for awards to the surviving family members in substantial amounts in recognition of their profound loss.

This action has been brought by Plaintiff on behalf of Alisa Michelle Flatow's parents, Rosalyn and Stephen M. Flatow, sisters Gail, Francine and Ilana Flatow, and brother Etan Flatow. Based upon all of the testimony referred to above, the Court finds that awards in the following amounts are appropriate in compensation for the loss suffered by each individual member of the Flatow family:

| | |
|---|---|
| Stephen M. Flatow (father): | $5,000,000.00 |
| Rosalyn Flatow (mother): | $5,000,000.00 |
| Gail Flatow (sister): | $2,500,000.00 |
| Francine Flatow (sister): | $2,500,000.00 |
| Ilana Flatow (sister): | $2,500,000.00 |
| Etan Flatow (brother): | $2,500,000.00 |

### D. PUNITIVE DAMAGES

■ The recent amendments to the FSIA included the right to punitive damages for personal injury or death resulting from an act of state sponsored terrorism. *See* 28 U.S.C. § 1605(a)(7); 28 U.S.C.A. § 1605 note. Punitive damages are designed "to punish [a defendant] for his outrageous conduct and to deter him and others like him from similar conduct in the future." RESTATEMENT (SECOND) TORTS § 908(1) (1977); *see also Pacific Mut. Life. Ins. Co. v. Haslip,* 499 U.S. 1, 15, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991). As only one court has thus far entered an award of punitive damages under these new amendments, *see Alejandre* at 1250–53, Plaintiff looks to traditional principles of tort law and analogous opinions under the Alien Tort Claims Act, 28 U.S.C. § 1350, and the Torture Victim Protection Act, 28 U.S.C.A. § 1350 note, for guidance.

■ General principles of tort law identify elements which factor into the analysis of whether to award punitive damages, and the appropriate amount of damages, including the character of the defendant's act; the nature and extent of harm to plaintiff that the defendant caused or intended to cause; the need for deterrence; and the wealth of the defendant. RESTATEMENT (SECOND) TORTS 908(1)-(2) (1977).

In *Filartiga v. Pena–Irala,* 577 F.Supp. 860, 865 (E.D.N.Y.1984), the Court indicated

that the character of the act is the paramount consideration in determining whether, and to what extent, punitive damages are warranted. The evidence shows that the Defendants subsidize a group, the Shaqaqi faction of Palestine Islamic Jihad, which has no social agenda other than to undermine the Middle East peace process through terrorist attacks, primarily against Israeli targets.

As it proved impossible to fight terrorism by bringing the terrorists themselves to justice, Congress created jurisdiction over and rights of action against foreign state sponsors of terrorism. By creating these rights of action, Congress intended that the Courts impose a substantial financial cost on states which sponsor terrorist groups whose activities kill American citizens. This cost functions both as a direct deterrent, and also as a disabling mechanism: if several large punitive damage awards issue against a foreign state sponsor of terrorism, the state's financial capacity to provide funding will be curtailed.

In the only precedent under this statute, the District Court for the Southern District of Florida assessed three percent of the value of the Cuban Air Force's MiG fleet, $137.7 million, as punitive damages for the murder of three American private aircraft pilots. *Alejandre* at 1253. Cases under the Alien Tort Claims Act and the Torture Victim Protection Act often result in multimillion dollar punitive damages awards against individual defendants for torture and extrajudicial killings. *See id* at 1251 n. 10 (citing cases). The Torture Victim Protection Act has become notorious for its pyrrhic victories; although Courts have entered remarkably high punitive damages awards, the defendants are invariably judgment-proof. *See* Christopher W. Haffke, *The Torture Victim Protection Act: More Symbol than Substance,* 43 EMORY L.J. 1467 (1994); Jennifer Correale, *The Torture Victim Protection Act: A Vital Contribution to International Human Rights Enforcement or Just a Nice Gesture?,* 6 PACE INT'L L. REV. 197 (1994); *see also* Jean–Marie Simon, *The Alien Tort Claims Act: Justice or Show Trials?,* 11 B.U. INT'L L.J. 1 (1993).

The attack on the No. 36 Egged bus in the Gaza Strip which inflicted fatal injuries to Alisa Michelle Flatow and seven Israelis has been demonstrated by the testimony to have been part of an extensive campaign of terror carried out to obtain the political ends of the Islamic Republic of Iran. The Court can find no case law in support of the proposition that premeditated violent acts undertaken upon civilian targets are a legitimate part of the actions of any government. Factors which may be considered in determining an appropriate amount of punitive damages may be grouped under a few broad headings, including: (1) the nature of the act itself, and the extent to which any civilized society would find that act repugnant; (2) the circumstances of its planning; (3) Defendants' economic status with regard to the ability of Defendants to pay; and (4) the basis upon which a Court might determine the amount of an award reasonably sufficient to deter like conduct in the future, both by the Defendants and others.

Alisa Michelle Flatow died as a result of an unanticipated attack, from the effects of shrapnel which penetrated her brain. The device used to inflict these injuries consisted of an explosive charge surrounded by an ersatz collection of metal fragments whose intended purpose was to inflict injury in the most severe manner imaginable upon those exposed to the device. While the death of any young person is tragic, a killing under these circumstances extends to the very limits of any human being's capacity to inflict pain and suffering upon another. The evidence has shown that in addition to Alisa Michelle Flatow, this bus was filled with other young people, and therefore Alisa Michelle Flatow, together with the other young persons aboard the bus, rather than being a mere incidental casualty of a violent act, was in fact the target of this malicious activity.

The videotape taken at the scene, together with the testimony of at least four witnesses on the scene, makes clear that the attack was the result of careful planning and was carried out with what might be described as vicious inspiration. This too calls for an appropriate response.

The economic position of the Defendants in this case was detailed in very precise expert testimony by Dr. Patrick Clawson. That

testimony set forth precise information, widely published, regarding Iranian economy. Most significantly, Dr. Clawson testified, based upon information obtained from that published, reliable reports, the Islamic Republic of Iran's oil exports generate hard currency income of at least twelve billion dollars per year. Clearly, the Defendants in this case are able to respond in damages to an award in a very significant amount.

Dr. Clawson's testimony detailed an annual expenditure of approximately seventy-five million dollars for terrorist activities. Dr. Clawson testified that the Islamic Republic of Iran is so brazen in its sponsorship of terrorist activities that it carries a line item in its national budget for this purpose.

Based upon his analysis of past interaction between the current Iranian government and the United States, in particular the 1979–81 hostage crisis and the United States' reflagging of Kuwaiti oil tankers, Dr. Clawson testified that in his opinion, the Islamic Republic of Iran, when implementing its national policy, is extremely responsive to the ultimatums made by the United States government. Dr. Clawson stated that in his opinion, a factor of three times its annual expenditure for terrorist activities would be the minimum amount which would affect the conduct of the Islamic Republic of Iran, and that a factor of up to ten times its annual expenditure for terrorism must be considered to constitute a serious deterrent to future terrorist activities aimed at United States nationals.

This Court is cognizant that the purpose of this statute is to deter acts of terrorism which result in the death or personal injury of United States nationals. In this Court's judgment, in order to ensure that the Islamic Republic of Iran will refrain from sponsoring such terrorist acts in the future, an award of punitive damages in the amount of three times the Islamic Republic of Iran's annual expenditure for terrorist activities is appropriate.

## CONCLUSION

This Court possess subject matter jurisdiction over this action and personal jurisdiction over Defendants. Plaintiff has established to this Court's satisfaction, pursuant to 28 U.S.C. § 1608(e), and by clear and convincing evidence, that Defendants, the Islamic Republic of Iran, the Iranian Ministry of Information and Security, Ayatollah Ali Hoseini Khamenei, former President Ali Akbar Hashemi–Rafsanjani, and former Minister Ali Fallahian–Khuzestani, are jointly and severally liable for all damages awarded by this Court to Plaintiff Stephen M. Flatow, in his own right, as Administrator of the Estate of Alisa Michelle Flatow, and on behalf of decedent's heirs-at-law, for their provision of material support and resources to a terrorist group which caused the extrajudicial killing of Alisa Michelle Flatow.

A separate order shall issue this date.